[No. 15984. *En Banc.* April 22, 1921.]

THE STATE OF WASHINGTON, *Respondent*, v.
GEORGE MENINOCK, *Appellant.*

THE STATE OF WASHINGTON, *Respondent*, v.
JIM WALLEHEY, *Appellant.*

THE STATE OF WASHINGTON, *Respondent*, v.
AL BARNHARDT, *Appellant.*

THE STATE OF WASHINGTON, *Respondent*, v.
A. J. BARNHARDT, *Appellant.*[1]

INDIANS (1)—INDIAN TREATY—RIGHT TO FISH OUTSIDE RESERVA-
TION—EASEMENT—STATE REGULATION. The reservation by the Yaki-
ma Indians of fishing rights at the usual and accustomed places in
the territory ceded by them to the United States in the Treaty of
1859 did not foreclose the power of the state, outside the land
specially granted to the Yakima Nation, to enact proper regulatory
measures to protect the propagation of fish, applicable alike to the
Indians and the citizens of the state (MACKINTOSH, HOLCOMB, and
BRIDGES, JJ., dissent).

Consolidated appeals from judgments of the supe-
rior court for Benton county, Truax, J., entered Feb-
ruary 18, 1920, upon convictions for the violation of
laws relating to the taking of fish. Affirmed.

*Francis A. Garrecht,* for appellants.

*The Attorney General* and *G. W. Hamilton,* for re-
spondent.

PARKER, C. J.—These defendants are Yakima In-
dians, maintaining their tribal relations and living up-
on the Yakima Indian reservation, in this state. They
were separately charged, adjudged guilty, and fined
ten dollars each, in the superior court for Yakima
county, for fishing within four hundred feet below the
Prosser dam in the Yakima river at Prosser in that

'Reported in 197 Pac. 641.

county, in violation of certain provisions of our fisheries code, the place of such fishing being outside the Yakima Indian reservation, but within the territory ceded to the United States by the Indians by the treaty of 1859 between the United States and the Yakima nation of Indians. 12 U. S. Stat. at L. 951. From the judgments of the superior court so rendered, the defendants have each appealed to this court. The questions here to be determined being the same in each case, by agreement of counsel they are all presented together.

It is conceded that appellants would have been rightly convicted but for the fact that they are Yakima Indians, maintaining their tribal relations and residing upon the Yakima Indian reservation. It is argued in behalf of appellants, as it was in *State v. Towessnute,* 89 Wash. 478, 154 Pac. 805, that they are immune from prosecution under our fisheries code for fishing in violation of its terms at the place in question; because of the provisions of the treaty of 1859, and especially the provision found in article III thereof, reading as follows:

"The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, . . ."

It is conceded that the place in question is one of the "accustomed places" of fishing by the Indians, within the ceded territory. The problem here presented for solution is in principle exactly that which was presented in *State v. Towessnute, supra,* and decided adversely to the contentions made in behalf of appellants rested upon this treaty provision; and unless we are to overrule the decision rendered in that case, plainly

it becomes controlling in these cases and calls for a decision of this court affirming the judgments of the superior court here upon review. We are constrained to adhere to the conclusion reached in that case; to which there is found support, all but conclusive, in the later decision of the supreme court of the United States in *Kennedy v. Becker,* 241 U. S. 556, rendered a few months following the rendering of our decision in *State v. Towessnute.* In *Kennedy v. Becker,* there was drawn in question the validity of certain provisions of the conservation law of the state of New York, as against certain Indians, prohibiting the taking of fish from the waters of the state, at certain times and under certain conditions. The argument there made in behalf of the Indians, as in this case, was, that under a reserved right in a grant of lands made by the Indians to Robert Morris, which grant was required to be, and was, approved by the Federal government, and became in substance a treaty ceding sovereign power over the lands, the Indians were not subject to restriction under the conservation law of New York, as other persons were. Justice Hughes, speaking for the court, in holding that the right of fishing reserved in the Indians under the terms of the grant did not limit the state in the exercise of its sovereign power to pass laws looking to the conservation of fish and game, such as would restrict the Indians' right to fish at the place in question the same as the rights of other people, said:

"The convention is in the form of an indenture by which (identifying the tract as being part of that embraced in the Hartford Convention) these lands were granted by the sachems, chiefs and warriors of the Seneca Nation to Robert Morris 'his heirs and assigns forever.' The lands—which were soon resold—thus passed by the conveyance into private ownership

and were subject to the jurisdiction and sovereignty of the State of New York. The grant contained the following reservation which is in question here: 'Also, excepting and reserving to them, the said parties of the first part and their heirs, the privilege of fishing and hunting on the said tract of land hereby intended to be conveyed.'

"The right thus reserved was not an exclusive right. Those to whom the lands were ceded, and their grantees, and all persons to whom the privilege might be given, would be entitled to hunt and fish upon these lands, as well as the Indians of this tribe. And, with respect to this non-exclusive right of the latter, it is important to observe the exact nature of the controversy. It is not disputed that these Indians reserved the stated privilege both as against their grantees and all who might become owners of the ceded lands. We assume that they retained an easement, or profit *a prendre,* to the extent defined; that is not questioned. The right asserted in this case is against the state of New York. It is a right sought to be maintained in derogation of the sovereignty of the state. It is not a claim for the vindication of a right of private property against any injurious discrimination, for the regulations of the state apply to all persons equally. It is the denial with respect to these Indians, and the exercise of the privilege reserved, of all state power of control or reasonable regulation as to lands and waters otherwise admittedly within the jurisdiction of the state.

"It is not to be doubted that the power to preserve fish and game within its borders is inherent in the sovereignty of the state (*Geer v. Connecticut,* 161 U. S. 519; *Ward v. Racehorse,* 163 U. S. 504, 507), subject of course to any valid exercise of authority under the provisions of the Federal Constitution. It is not denied—save as to the members of this tribe—that this inherent power extended over the *locus in quo* and to all persons attempting there to hunt or fish, whether they are owners of the lands or others. The contention for the plaintiffs in error must, and does, go to the extent of insisting that the effect of the reservation

was to maintain in the tribe sovereignty *quoad hoc.*
As the plaintiffs in error put it: 'The land itself be-
came thereby subject to a joint property ownership
and the dual sovereignty of the two peoples, white and
red, to fit the case intended, however infrequent such
situation was to be.' We are unable to take this view.
It is said that the state would regulate the whites and
that the Indian tribe would regulate its members, but
if neither could exercise authority with respect to the
other at the *locus in quo,* either would be free to des-
troy the subject of the power. Such a duality of sov-
ereignty instead of maintaining in each the essential
power of preservation would in fact deny it to both.

"It has frequently been said that treaties with the
Indians should be construed in the sense in which the
Indians understood them. But it is idle to suppose
that there was any actual anticipation at the time the
treaty was made of the conditions now existing to
which the legislation in question was addressed.
Adopted when game was plentiful—when the cultiva-
tion contemplated by the whites was not expected to
interfere with its abundance—it can hardly be sup-
posed that the thought of the Indians was concerned
with the necessary exercise of inherent power under
modern conditions for the preservation of wild life.
But the existence of the sovereignty of the state was
well understood, and this conception involved all that
was necessarily implied in that sovereignty, whether
fully appreciated or not. We do not think that it is a
proper construction of the reservation in the convey-
ance to regard it as an attempt either to reserve sov-
ereign prerogative or so to divide the inherent power
of preservation as to make its competent exercise im-
possible. Rather are we of the opinion that the clause
is fully satisfied by considering it a reservation of a
privilege of fishing and hunting upon the granted
lands in common with the grantees, and others to whom
the privilege might be extended, but subject neverthe-
less to that necessary power of appropriate regula-
tion, as to all those privileged, which inhered in the
sovereignty of the state over the lands where the priv-
ilege was exercised. This was clearly recognized in

*United States v. Winans*, 198 U. S. 371, 384, where the court in sustaining the fishing rights of the Indians on the Columbia River, under the provisions of the treaty between the United States and the Yakima Indians, ratified in 1859, said (referring to the authority of the state of Washington): 'Nor does it' (that is, the right of 'taking fish at all usual and accustomed places') 'restrain the state unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enable the right to be exercised.' "

These observations of the learned justice, it seems to us, leave little to be said in support of our conclusion reached in *State v. Towessnute*. Counsel for appellants invoke the law as announced in the later decision of the supreme court of the United States in *Seufert Bros. Co. v. United States*, 249 U. S. 194. That case did not, however, call for any inquiry touching the exercise of the sovereign power of a state to pass laws looking to the conservation of fish and game such as our fisheries code and the New York conservation law. That decision, like the decision in *United States v. Winans*, 198 U. S. 371, considered only a reserved right as against the private ownership of the land in question. We are quite convinced that the judgments of conviction rendered against appellants must be affirmed. A further discussion of the questions involved would be but to repeat and elaborate upon what is said in *State v. Towessnute*.

The judgments are affirmed.

FULLERTON, MAIN, TOLMAN, and MOUNT, JJ., concur.

HOLCOMB and BRIDGES, JJ., dissent.

MACKINTOSH, J. (dissenting)—No argument based upon the theory that the state has a right, in exercising the protection of its game and fish, to violate a solemn treaty made with Indian tribes, can receive the

sanction of my conscience or my reason. I am unalterably of the opinion that the decision of this court in the *Towessnute* case is incorrect, and that the majority opinion in the instant case, following that decision, is wrong.

I have no patience with the violation of plain treaty provisions based in fact upon the strength of the violator and the weakness of the violated, but supported in theory by ingenious reasons and excuses. Such conduct is more fittingly engaged in by the Hun than by the civilized.

My inclination would be to go more extensively into an argument on this question were it not for the fact that the legislature of this state, in session in the present year, passed an act (Laws of 1921, p. 173, ch. 58) recognizing the injustice of the *Towessnute* decision and seeking to keep faith with the Yakima Nation. I content myself, therefore, with merely dissenting from the majority opinion.