[No. 20439. Department Two. March 31, 1927.]

THE STATE OF WASHINGTON, *Respondent*, v. JIM
WALLAHEE, *Appellant*.[1]

[1] INDIANS (1)—TREATIES—RIGHT TO HUNT OUTSIDE RESERVATION.
The Indian Treaty of 1855, reserving to the Indians the privilege
of hunting upon "open and unclaimed lands," did not foreclose
the right of the state, succeeding to the sovereign power of the
Federal government, to regulate and prohibit the taking of game
on "open and unclaimed" Federal lands outside the Indian
Reservation.

Appeal from a judgment of the superior court for
Kittitas county, Davidson, J., entered June 29, 1926,
upon conviction of violation of the game law. Affirmed.

*Roy C. Fox*, and *E. J. Farley*, for appellant.

*The Attorney General, E. W. Anderson, Assistant*,
and *Arthur McGuire*, for respondent.

TOLMAN, J.—Appellant is an Indian of the Yakima
tribe, residing on the Yakima Indian reservation, and
appeals from a conviction upon a charge of having in
his possession, in Kittitas county and east of the sum-
mit of the Cascade mountains, on November 11, 1924,
a dead female deer. It is stipulated that appellant
killed the deer at the place charged while hunting upon
open and unclaimed lands, then and now belonging to
the United States. It should be borne in mind that
these lands are without the Indian reservation. The
defense below was, and it is here contended, that,
notwithstanding the game laws of the state, appellant,
as a member of the Yakima tribe of Indians, may take
game at will on any open and unclaimed government
lands by reason of certain provisions of the treaty of
June 9, 1855, entered into by the United States govern-

¹Reported in 255 Pac. 94.

ment, acting through and by Governor Isaac I. Stevens, with the Yakima Indian tribe. The treaty provision referred to reads:

"The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at the usual and customary places, in common with the citizens of the Territory, and of erecting temporary build-ings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

This is the identical treaty and, indeed, the identical article of the treaty discussed and considered by this court in *State v. Towessnute*, 89 Wash. 478, 154 Pac. 805; *State v. Alexis*, 89 Wash. 492, 154 Pac. 810, 155 Pac. 1041, and *State v. Meninock*, 115 Wash. 528, 197 Pac. 641. Those cases, however, are concerned only with the fishing rights under the treaty, while this case involves the hunting privilege. Appellant seems to contend that those cases are not decisive of this because of the employment of the term "in common with the citizens of the territory" in connection with the fishing rights, while no such limiting phrase is used in connection with the hunting right or privilege.

It is true that, in the *Towessnute* case, an argument was based upon these words, but only as an added consideration. The real question and the whole question was decided by that part of the opinion which holds that the United States government was the sovereign and did not undertake to part with its sovereign rights by the treaty, that the Yakima tribe was not an independent nation nor a sovereign entity of any kind, the Indians being mere occupants of the land, and at that time and ever since were subject to the

sovereignty of the United States; that then, and at all times up to statehood, the Federal government had the sovereign power to regulate or forbid the taking of game; and within our territorial jurisdiction, that sovereign power passed to the state of Washington when admitted to statehood. The other cases in this court follow the *Towessnute* case, though in the *Meninock* case Judge Parker ably supported and added to the argument of the earlier case. It is useless to repeat or quote from these earlier decisions. Almost every word is in point, and we are bound by their logic no less than by the rule of precedent.

Since, however, the facts there involved fit the facts here to a nicety, and the treaty provision there involved is practically identical with the one here involved, we take the liberty of quoting the language of Chief Justice White in the case of *Ward v. Race Horse,* 163 U. S. 504, which case was cited and relied upon in the *Towessnute* case, but not quoted from. Said the Chief Justice:

"It is undoubted that the place in the state of Wyoming, where the game in question was killed, was at the time of the treaty, in 1868, embraced within the hunting districts therein referred to. But this fact does not justify the implication that the treaty authorized the continued enjoyment of the right of killing game therein, when the territory ceased to be a part of the hunting districts and came within the authority and jurisdiction of a state. . . .

"The argument, now advanced, in favor of the continued existence of the right to hunt over the land mentioned in the treaty, after it had become subject to state authority, admits that the privilege would cease by the mere fact that the United States disposed of its title to any of the land, although such disposition, when made to an individual, would give him no authority over game, and yet that the privilege continued when the United States had called into being a sover-

eign state, a necessary incident of whose authority was the complete power to regulate the killing of game within its borders. This argument indicates at once the conflict between the right to hunt in the unoccupied lands, within the hunting districts, and the assertion of the power to continue the exercise of the privilege in question in the state of Wyoming in defiance of its laws. . . .

"The power of all the states to regulate the killing of game within their border will not be gainsaid, yet, if the treaty applies to the unoccupied land of the United States in the state of Wyoming, that state would be bereft of such power, since every isolated piece of land belonging to the United States as a private owner, so long as it continued to be unoccupied land, would be exempt in this regard from the authority of the state. Wyoming, then, will have been admitted into the Union, not as an equal member, but as one shorn of a legislative power vested in all the other states of the Union, a power resulting from the fact of statehood and incident to its plenary existence. . . . The enabling act declares that the state of Wyoming is admitted on equal terms with the other states, and this declaration, which is simply an expression of the general rule, which presupposes that states, when admitted into the Union, are endowed with powers and attributes equal in scope to those enjoyed by the states already admitted, repels any presumption that in this particular case Congress intended to admit the state of Wyoming with diminished governmental authority. The silence of the act admitting Wyoming into the Union, as to the reservation of rights in favor of the Indians, is given increased significance by the fact that Congress in creating the territory expressly reserved such rights. Nor would this case be affected by conceding that Congress, during the existence of the territory, had full authority in the exercise of its treaty-making power to charge the territory, or the land therein, with such contractual burdens as were deemed best, and that when they were imposed on a territory it would be also within the power of Congress to continue them in the state, on its

admission into the Union. Here the enabling act not only contains no expression of the intention of Congress to continue the burdens in question in the state, but, on the contrary, its intention not to do so is conveyed by the express terms of the act of admission. . . . Here the nature of the right created gives rise to no such implication of continuance, since by its terms, it shows that the burden imposed on the territory was essentially perishable and intended to be of a limited duration. Indeed, the whole argument of the defendant in error rests on the assumption that there was a perpetual right conveyed by the treaty, when in fact the privilege given was temporary and precarious. But the argument goes further than this, since it insists that, although by the treaty the hunting privilege was to cease whenever the United States parted merely with the title to any of its lands, yet that privilege was to continue, although the United States parted with its entire authority over the capture and killing of game. . . ."

Under the authority of our own decisions and under the authority of *Ward v. Race Horse, supra,* had we not already decided the question, the judgment would have to be and it is affirmed.

PARKER, ASKREN, and FRENCH, JJ., concur.

MACKINTOSH, C. J., dissents.