[No. 28079. *En Banc.* January 13, 1941.]

THE STATE OF WASHINGTON, *Respondent*, v. SAMPSON TULEE, *Appellant.*[1]

[1]Reported in 109 P. (2d) 280.

*Lyle Keith* (*Kenneth R. L. Simmons,* of counsel), for appellant.

*The Attorney General, T. H. Little, Assistant,* and *Edgar H. Canfield,* for respondent.

BEALS, J.—Defendant herein, Sampson Tulee, a member of the Yakima tribe of Indians, was charged by information filed in the superior court for Klickitat county, Washington, with the offense of having, May 6, 1939, caught salmon and food fish with a dip bag net, and with selling commercially the fish which he had caught, all without first having obtained a license to fish, as required by Rem. Rev. Stat. (Sup.), § 5703 [P. C. § 2460], Laws of 1937, chapter 149, p. 529, § 1.

Tulee claiming that, under the treaty of June 9, 1855 (12 U. S. Stat. 951), he, as a member of the Yakima tribe of Indians, had the right to catch fish as he did, the United States, on behalf of its ward, Sampson Tulee, the defendant, petitioned the United States district court for the eastern district of Washington for a writ of *habeas corpus.* After due proceedings had, the United States district court held that the right secured to the Yakima tribe of Indians by the treaty referred to was subject to the paramount and superior right of the state, in the exercise of its sovereign police powers, to reasonably regulate the taking of salmon from the waters within its jurisdiction, and denied the petition for the writ.

On appeal to the United States circuit court, that court held that, while it had jurisdiction of the case, it was not a proper cause for the exercise of such jurisdiction, and, following the rule laid down in the case

of *United States ex rel. Kennedy v. Tyler,* 269 U. S. 13, 70 L. Ed. 138, 46 S. Ct. 1, held that the cause should be tried in the state courts, subject to review of any judgment of this court before the supreme court of the United States.

The cause then proceeded before the superior court for Klickitat county on an amended information charging defendant with having caught, at one of the usual and accustomed ancient fishing places of the Yakima tribe of Indians, as defined in the treaty above referred to, certain food fish and salmon, and selling the same commercially without having obtained a license for the taking thereof, as required by the state law. On arraignment, defendant entered a plea of not guilty, and demurred to the information on the grounds that the facts charged do not constitute a crime, and that the information contained matter which, if true, constitutes a legal bar to the action. The demurrer was overruled by the trial court, and the action proceeded to trial before the court and jury. Defendant objected to the introduction of any testimony, and moved for a directed verdict of not guilty, his objection and motion having been overruled. The jury returned a verdict of guilty, whereupon defendant moved in arrest of judgment and for a new trial. These motions having been denied, judgment was entered upon the verdict, and sentence imposed. Defendant was admitted to bail, and appeals to this court from the judgment of guilty and sentence imposed thereon.

Error is assigned upon the overruling of appellant's demurrer to the amended information; upon the overruling of his objections to the introduction of any evidence; upon the denial of his motion for a directed verdict; and upon the denial of his motions in arrest of judgment or for a new trial. Appellant also assigns error upon certain instructions given by the

court, and upon the refusal of the trial court to give two instructions which appellant requested.

The only question raised upon this appeal is whether appellant, as a member of the Yakima tribe of Indians, was, under the treaty between the United States and the Yakima tribe, entitled to catch fish in the Columbia river, without the territorial limits of the Yakima Indian reservation, without regard to the statutes of the state of Washington covering the taking of food fish from the lakes and rivers within this state.

During the latter part of May and the first part of June, 1855, the United States, represented by Governor Isaac I. Stevens, who was governor of the then territory of Washington, and also the agent of the United States for dealing with the Indian tribes inhabiting the territory, held a council with the Yakima Indians and other tribes, at Walla Walla valley, Washington territory. As the result of this council, the treaty of June 9, 1855, between the United States and the Yakima tribe, was signed. By this treaty the territorial limits of the reservation assigned to the Yakimas were fixed. The portion of the treaty pertinent to the facts in the case at bar is the second paragraph of article 3, which reads as follows:

"The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them . . ."

We are not here concerned with the right of the Indians to take fish from the streams running through or bordering upon the reservation. We are concerned only with the latter portion of the paragraph of the treaty quoted, which secured to the Indians the right

to fish "at all usual and accustomed places, in common with citizens of the Territory."

All treaties with Indian tribes are construed by the courts in favor of the Indians, in an endeavor to exercise toward them the highest degree of good faith, because of the dominant position of the United States government. *United States v. Kagama*, 118 U. S. 375, 30 L. Ed. 228, 6 S. Ct. 1109; *Choctaw Nation v. United States*, 119 U. S. 1, 30 L. Ed. 306, 7 S. Ct. 75; *Jones v. Meehan*, 175 U. S. 1, 44 L. Ed. 49, 20 S. Ct. 1; *United States v. Winans*, 198 U. S. 371, 49 L. Ed. 1089, 25 S. Ct. 662.

At the time of the making of the treaty, the then territory of Washington was largely wild land, sparsely inhabited. The Yakimas were a powerful tribe, and the making of the treaty with them was an important step in the process of establishing orderly government and providing for the settlement of the territory. Fishing was an important part of the life of the Indians, and the right secured to the tribe to catch fish not only on the reservation but at other accustomed fishing places off the reservation, was then to them a valuable right.

In connection with this treaty, appellant earnestly invites our attention to a certified copy of the minutes of the proceedings of the council above referred to, held between representatives of the United States and various bands of Indians, including the Yakima tribe, which resulted in the treaty of June 9, 1855. Governor Isaac I. Stevens, the senior representative of the United States present, as shown by the minutes of the council, repeatedly assured the Indians that they would not be wronged, that their treaty rights would be protected, and that the provisions of the treaty would be faithfully carried out. The minutes show that, on June 5th, Governor Stevens assured the Indi-

ans that they would be allowed to go to the usual fishing places and fish in common with the whites.

In the early case of *Johnson v. McIntosh,* 21 U. S. 543, 5 L. Ed. 681, the court recognized the rights of the Indians, saying: "All our institutions recognise the absolute title of the crown, subject only to the Indian right of occupancy."

This court, in the case of *Pioneer Packing Co. v. Winslow,* 159 Wash. 655, 294 Pac. 557, held that the state had no jurisdiction over the Indians, in so far as their right to fish in streams flowing through or bordering upon a reservation was secured to them by a treaty similar to that above referred to.

In interpreting Indian treaties, the rule has been followed that rights not expressly granted by the Indians are reserved to them. *Winters v. United States,* 207 U. S. 564, 52 L. Ed. 340, 28 S. Ct. 207.

On several different occasions this court has considered the question here presented. While admitting the force of our previous decisions, appellant asks that this question be reexamined, particularly in the light of the record of the council between Governor Stevens and the Indians above referred to, the existence of which record was not known at the time the prior cases were decided.

In the case of *State v. Towessnute,* 89 Wash. 478, 154 Pac. 805, it appeared that the defendant was charged with violation of the state game laws governing the taking of food fish. The defendant, a member of the Yakima tribe, had caught salmon at a point on the Yakima river several miles outside of the Yakima reservation. The defendant had not procured a fishing license, and had snagged the salmon with a gaff hook, thereby admittedly violating the state game law and rendering himself subject to prosecution,

unless the clause of the treaty hereinabove quoted gave him the right to fish at the point on the Yakima river where he had taken the salmon, free from the limitations provided by the statutes of this state. The trial court sustained the defendant's demurrer to the information and dismissed the proceeding. On appeal, this court reversed the trial court, holding that the information was good, and that the demurrer thereto was erroneously sustained.

In the case of *State v. Alexis,* 89 Wash. 492, 154 Pac. 810, 155 Pac. 1041, the right of a member of the Lummi tribe of Indians, under the treaty entered into in 1859 between the United States and the Lummi tribe, to fish outside of the Lummi reservation was considered. The treaty with the Lummis contained a provision similar to that contained in the treaty with the Yakimas. In the superior court, the defendant was convicted of violating the state statutes regulating the taking of fish, and on appeal the conviction was affirmed, this court, in a short per curiam opinion, stating that the same question was presented as that which the court had just decided in the *Towessnute* case, *supra.* On petition for rehearing, this court, in a supplemental per curiam opinion, referred to certain testimony introduced before the trial court, which it was contended showed some contemporaneous interpretation of the treaty in favor of the rights of the Indians to fish, and also showed some statements, on the part of Governor Stevens, referring to the rights of the Indians under the treaty. The court approved the original opinion in the case.

In *State v. Meninock,* 115 Wash. 528, 197 Pac. 641, it appeared that four members of the Yakima tribe had been charged with fishing in the Yakima river, in violation of the state fisheries code. The place where the defendants had taken fish was outside the Yakima res-

ervation, but fell within the provision of the treaty with the Yakimas with which we are here concerned. The four cases were consolidated on appeal, and by a decision of this court sitting *En Banc*, the judgments appealed from, by which the defendants were found guilty before the superior court, were affirmed.

In the case of *State v. Wallahee*, 143 Wash. 117, 255 Pac. 94, the defendant, a member of the Yakima tribe, was charged with having in his possession, on a date specified, a dead female deer. It was admitted that the defendant killed the deer outside the boundaries of the Yakima reservation, while hunting upon open and unclaimed lands belonging to the United States. The treaty with the Yakimas reserved to the Indians the right to take game on any open and unclaimed government lands. The defendant was convicted before the superior court of violation of the game law, and on appeal the judgment was affirmed.

On behalf of the state of Washington, respondent herein, it is argued that Rem. Rev. Stat. (Sup.), § 5703, providing for the issuance of licenses authorizing the licensee to fish within the waters of this state, is a lawful exercise of the police power of the state in regulating fishing within its borders. Respondent relies upon the proposition that the powers of the Federal government are limited to those granted to it either expressly or by implication in the constitution of the United States, all other powers being reserved to the states. This matter was discussed by the supreme court of the United States in the case of *Prigg v. Pennsylvania*, 41 U. S. 539, 10 L. Ed. 1060, in which the court used the following language:

"To guard, however, against any possible misconstruction of our views, it is proper to state, that we are by no means to be understood, in any manner whatsoever, to doubt or to interfere with the police power belonging to the states, in virtue of their general

sovereignty. That police power extends over all subjects within territorial limits of the states, and has never been conceded to the United States."

In the case of *Atlantic Coast Line R. Co. v. Goldsboro,* 232 U. S. 548, 58 L. Ed. 721, 34 S. Ct. 364, is found the following:

"For it is settled that neither the 'contract' clause or the 'due process' clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise."

Upon admission to the Union, a state assumes all the rights and powers the exercise of which is enjoyed by her sister commonwealths, each state, regardless of the date of its admission to the Union, standing on a basis of equality with the other states. *Coyle v. Smith,* 221 U. S. 559, 55 L. Ed. 853, 31 S. Ct. 688.

In the case of *Ward v. Race Horse,* 163 U. S. 504, 41 L. Ed. 244, 16 S. Ct. 1076 (cited in the case of *State v. Towessnute, supra),* the supreme court had before it for consideration a question very similar to that here presented. The case is of great interest, for the reason that it lays down principles applicable to several phases of the case at bar. It appeared that, by the treaty of 1869 between the United States and the Bannock Indians, it was agreed that the Indians

" ' . . . shall have the right to hunt on the unoccupied lands of the United States, so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts.' "

Prior to the making of this treaty, Congress had established the territory of Wyoming, the act creating

a territory providing that nothing therein contained should impair the treaty rights of the Indians as they then existed. In 1890, Wyoming was admitted to the Union, and in 1895 the state legislature enacted a statute regulating the killing of wild game. Thereafter, the defendant in the case, one Race Horse, a Bannock Indian, was charged with killing elk upon unoccupied land of the United States, in violation of the state statute. The defendant relied upon the treaty above referred to. The case went before the supreme court of the United States by way of a writ of *habeas corpus*. In the course of the opinion, in which it was held that the defendant could not avail himself of the provisions of the treaty between the United States and his tribe, the court stated:

"The act which admitted Wyoming into the Union, as we have said, expressly declared that that State should have all the powers of the other States of the Union, and made no reservation whatever in favor of the Indians. These provisions alone considered would be in conflict with the treaty if it was so construed as to allow the Indians to seek out every unoccupied piece of government land and thereon disregard and violate the state law, passed in the undoubted exercise of its municipal authority. But the language of the act admitting Wyoming into the Union, which recognized her coequal rights, was merely declaratory of the general rule. . . .

"The power of all the States to regulate the killing of game within their borders will not be gainsaid, yet, if the treaty applies to the unoccupied land of the United States in the State of Wyoming, that State would be bereft of such power, since every isolated piece of land belonging to the United States as a private owner, so long as it continued to be unoccupied land, would be exempt in this regard from the authority of the State. Wyoming, then, will have been admitted into the Union, not as an equal member, but as one shorn of a legislative power vested in all the other States of the Union, a power resulting from the fact

of statehood and incident to its plenary existence. Nor need we stop to consider the argument advanced at bar, that as the United States, under the authority delegated to it by the Constitution in relation to Indian tribes, has a right to deal with that subject, therefore it has the power to exempt from the operation of state game laws each particular piece of land, owned by it in private ownership within a State, for nothing in this case shows that this power has been exerted by Congress. The enabling act declares that the State of Wyoming is admitted on equal terms with the other States, and this declaration, which is simply an expression of the general rule, which presupposes that States, when admitted into the Union, are endowed with powers and attributes equal in scope to those enjoyed by the States already admitted, repels any presumption that in this particular case Congress intended to admit the State of Wyoming with diminished governmental authority. The silence of the act admitting Wyoming into the Union, as to the reservation of rights in favor of the Indians, is given increased significance by the fact that Congress in creating the Territory expressly reserved such rights. Nor would this case be affected by conceding that Congress, during the existence of the Territory, had full authority in the exercise of its treaty making power to charge the Territory, or the land therein, with such contractual burdens as were deemed best, and that when they were imposed on a Territory it would be also within the power of Congress to continue them in the State, on its admission into the Union. Here the enabling act not only contains no expression of the intention of Congress to continue the burdens in question in the State, but, on the contrary, its intention not to do so is conveyed by the express terms of the act of admission."

The *Race Horse* case is strikingly like that here presented. The act of Congress of March 2, 1853 (10 U. S. Stat. 172), providing for the organization of the territory of Washington, contains a provision with respect to treaties with Indian tribes, similar to that

contained in the act which organized the territory of Wyoming. In the *Race Horse* case, the Indian relied upon a provision of the treaty securing to the Indians the right to hunt upon the unoccupied lands of the United States, so long as peace subsisted. In the case at bar, the treaty with the Yakimas secured to them the right to hunt upon open and unclaimed lands belonging to the United States (*State v. Wallahee, supra*), in addition to the right to fish at their accustomed fishing places without the reservation. The organic act creating each territory preserved treaty rights enjoyed by the Indians. The enabling acts by which Washington and Wyoming were admitted to the Union, while differing somewhat in wording, are essentially the same.

■ It has several times been held that the treaty with the Yakimas established, in favor of the Indians, a perpetual servitude on the lands necessary for their use in taking fish at their accustomed fishing places without the boundaries of the reservation, and that lands conveyed by the United States or by the state are subject to this easement. *United States v. Winans,* 198 U. S. 371, 49 L. Ed. 1089, 25 S. Ct. 662; *Seufert Bros. Co. v. United States,* 249 U. S. 194, 63 L. Ed. 555, 39 S. Ct. 203; *United States v. Taylor,* 3 Wash. Ter. 88, 13 Pac. 333. There is, then, no dissent to the proposition that, under the treaty, the Indians are entitled to an easement on, over, and across such lands as they must use in enjoying the full benefit of their fishing rights.

In connection with the question to be here determined, the case of *People ex rel. Kennedy v. Becker,* 241 U. S. 556, 60 L. Ed. 1166, 36 S. Ct. 705, is of interest. Three members of the Seneca tribe of Indians were arrested by the authorities of the state of New York, charged with having in their possession certain

fish in violation of the state conservation law. . The defendants contended that, as members of the Seneca tribe, they were entitled to catch fish as they did, under a treaty made in the year 1797 between the . Seneca nation and Robert Morris, which treaty or convention had been made under authority of the United States, and had been ratified by the senate and proclaimed by the president. By the treaty, the Indians reserved to themselves and their heirs the privilege of fishing and hunting on the land conveyed. Discussing this right, the court said:

"The right thus reserved was not an exclusive right. Those to whom the lands were ceded, and their grantees, and all persons to whom the privilege might be given, would be entitled to hunt and fish upon these lands, as well as the Indians of this tribe. And, with respect to this non-exclusive right of the latter, it is important to observe the exact nature of the controversy. It is not disputed that these Indians reserved the stated privilege both as against their grantees and all who might become owners of the ceded lands. We assume that they retained an easement, or profit *à prendre*, to the extent defined; that is not questioned. The right asserted in this case is against the State of New York. It is a right sought *to be maintained in derogation of the sovereignty of the State. It is not a claim for the vindication of a right of private property against any injurious discrimination, for the regulations of the State apply to all persons equally. It is the denial with respect to these Indians, and the exercise of the privilege reserved, of all state power of control or reasonable regulation as to lands and waters otherwise admittedly within the jurisdiction of the State.

"It is not to be doubted that the power to preserve fish and game within its borders is inherent in the sovereignty of the State (*Geer v. Connecticut,* 161 U. S. 519; *Ward v. Racehorse,* 163 U. S. 504, 507), subject of course to any valid exercise of authority under the provisions of the Federal Constitution. It is not

denied—save as to the members of this tribe—that this inherent power extended over the *locus in quo* and to all persons attempting there to hunt or fish, whether they are owners of the lands or others. The contention for the plaintiffs in error must, and does, go to the extent of insisting that the effect of the reservation was to maintain in the tribe sovereignty *quoad hoc.* As the plaintiffs in error put it: 'The land itself became thereby subject to a joint property ownership and the dual sovereignty of the two peoples, white and red, to fit the case intended, however infrequent such situation was to be.' We are unable to take this view. It is said that the State would regulate the whites and that the Indian tribe would regulate its members, but if neither could exercise authority with respect to the other at the *locus in quo,* either would be free to destroy the subject of the power. Such a duality of sovereignty instead of maintaining in each the essential power of preservation would in fact deny it to both.

"It has frequently been said that treaties with the Indians should be construed in the sense in which the Indians understood them. But it is idle to suppose that there was any actual anticipation at the time the treaty was made of the conditions now existing to which the legislation in question was addressed. Adopted when game was plentiful—when the cultivation contemplated by the whites was not expected to interfere with its abundance—it can hardly be supposed that the thought of the Indians was concerned with the necessary exercise of inherent power under modern conditions for the preservation of wild life. But the existence of the sovereignty of the State was well understood, and this conception involved all that was necessarily implied in that sovereignty, whether fully appreciated or not. We do not think that it is a proper construction of the reservation in the conveyance to regard it as an attempt either to reserve sovereign prerogative or so to divide the inherent power of preservation as to make its competent exercise impossible. Rather are we of the opinion that the clause is fully satisfied by considering it a reservation of a privilege of fishing and hunting upon the

granted lands in common with the grantees, and others to whom the privilege might be extended, but subject nevertheless to that necessary power of appropriate regulation, as to all those privileged, which inhered in the sovereignty of the State over the lands where the privilege was exercised. This was clearly recognized in *United States v. Winans*, 198 U. S. 371, 384, where the court in sustaining the fishing rights of the Indians on the Columbia River, under the provisions of the treaty between the United States and the Yakima Indians, ratified in 1859, said (referring to the authority of the State of Washington): 'Nor does it' (that is, the right of "taking fish at all usual and accustomed places") 'restrain the State unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enable the right to be exercised.' "

The court cited the *Race Horse* case, and upheld the authority of the state of New York, as sought to be exercised pursuant to its conservation law.

In *The Cherokee Tobacco* case, 78 U. S. 616, 20 L. Ed. 227, it was held that, under the Federal internal revenue laws, a tax could be imposed upon tobacco grown by members of the Cherokee nation upon lands within the Cherokee reservation, notwithstanding a provision of the treaty between the United States and the Cherokee nation exempting the members of the tribe from the payment of any tax on farm products, " 'which is now or may be levied by the United States on the quantity sold outside of the Indian territory.' " Referring to the conflict between the internal revenue laws and the Indian treaty, the court said: "Undoubtedly one or the other must yield. The repugnancy is clear and they cannot stand together." In the course of its opinion, the court said:

"It need hardly be said that a treaty cannot change the Constitution or be held valid if it be in violation of that instrument. This results from the nature and fundamental principles of our government. The ef-

fect of treaties and acts of Congress, when in conflict, is not settled by the Constitution. But the question is not involved in any doubt as to its proper solution. A treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty. In the cases referred to these principles were applied to treaties with foreign nations. Treaties with Indian nations within the jurisdiction of the United States, whatever considerations of humanity and good faith may be involved and require their faithful observance, cannot be more obligatory. They have no higher sanctity; and no greater inviolability or immunity from legislative invasion can be claimed for them. The consequences in all such cases give rise to questions which must be met by the political department of the government. They are beyond the sphere of judicial cognizance. In the case under consideration the act of Congress must prevail as if the treaty were not an element to be considered. If a wrong has been done the power of redress is with Congress, not with the judiciary, and that body, upon being applied to, it is to be presumed, will promptly give the proper relief."

It was held that the treaty provisions must yield to the Federal laws providing for the collection of taxes.

In the case of *Bayside Fish Flour Co. v. Gentry,* 297 U. S. 422, 80 L. Ed. 772, 56 S. Ct. 513, the supreme court upheld the right of the state of California to proceed under its fish and game code, even though the enforcement of the act indirectly acted as a deterrent to the right to purchase fish taken on the high seas, and might incidentally affect interstate or foreign commerce.

In the case of *Patsone v. Pennsylvania,* 232 U. S. 138, 58 L. Ed. 539, 34 S. Ct. 281, the supreme court upheld a statute of the state prohibiting the killing of wild game by aliens, and held that a citizen of Italy, who claimed exemption from the act by reason of a treaty between the United States and the kingdom of

Italy, by which the citizens of the two nations were assured the enjoyment of certain rights and privileges, was subject to prosecution under the state law, notwithstanding the provisions of the treaty. It was held that no provision of the treaty operated to deprive the states of the exercise of their powers to the full extent.

In the case of *Geer v. Connecticut,* 161 U. S. 519, 40 L. Ed. 793, 16 S. Ct. 600, the supreme court considered the rights of the states to control the export of wild game, saying:

"Aside from the authority of the State, derived from the common ownership of game and the trust for the benefit of its people which the State exercises in relation thereto, there is another view of the power of the State in regard to the property in game, which is equally conclusive. The right to preserve game flows from the undoubted existence in the State of a police power to that end, which may be none the less efficiently called into play, because by doing so interstate commerce may be remotely and indirectly affected."

In the case of *State v. Morrin,* 136 Wis. 552, 117 N. W. 1006, the supreme court of Wisconsin affirmed a finding of guilty entered against a Chippewa Indian who had trapped fish with gill nets, contrary to the state game law. The defendant relied upon a treaty between the United States and the Chippewa Indians, securing to the latter the "right to hunt and fish therein until otherwise ordered by the President." It was held that, pursuant to the *Race Horse* case and other authorities cited, the treaty did not operate to confer upon the defendant the right to fish in violation of the state game law. The court also observed that the defendant had acquired United States citizenship and was not living on the reservation, and for that reason was not entitled to claim the benefit of any treaty rights. The decision was based upon both grounds.

In the case of *People v. Chosa,* 252 Mich. 154, 233 N. W. 205, the supreme court of Michigan upheld the right of a state to enforce its game laws against Indians who attempted to hunt and fish on lands which their tribe had ceded to the United States, the Indians claiming such rights under a treaty with the Federal government. It was stipulated that the defendants were entitled to enjoy "all the treaty rights and privileges" of the treaty. It was held that the defendants were "subject to the game laws of the State, on the lands covered by the treaties, to the same extent as the general public." The court also considered the question of the Indians' citizenship.

Under the authorities, it is clear that the state of Washington enjoys to the full the exercise of its police power, as an equal of the other states making up our Federal Union, including the original thirteen. Under the treaty, the members of the Yakima tribe are entitled to an easement to cross and use lands necessary to the enjoyment of their fishing rights at their old accustomed fishing places. Lands granted by the United States or the state remain subject to this servitude.

The minutes of the council between Governor Stevens and the Indians, at which council the treaty was made and executed, constitute a most interesting historical record, and show, as argued by appellant, that Governor Stevens, doubtless in the exercise of the utmost good faith, assured the Indians that the Federal government would faithfully carry out all terms and conditions of the treaty. To this day, the vast domain set apart to the tribe, comprising many acres of rich land, is enjoyed by the members of the Yakima tribe. Under the authorities, however, it must be held that, as to the right of the Indians to fish at points without the reservation, which right was se-

cured to them by the treaty "in common with citizens of the territory," such right has been limited by the statutes of the state of Washington governing the taking of fish and wild game, and that the decisions of this court hereinabove referred to correctly declared the law, and should be followed in the case at bar.

As observed by the supreme court of the United States in *The Cherokee Tobacco* case, *supra,* consideration of such a situation as this, if a wrong has been done, pertains to the legislative department of the government, the correction of the wrong, if one exists, being "beyond the sphere of judicial cognizance."

The judgment appealed from is accordingly affirmed.

ROBINSON, C. J., MAIN, STEINERT, and JEFFERS, JJ., concur.

SIMPSON, J. (dissenting)—I am unable to agree with the conclusion reached by the majority.

The pertinent provisions of the treaty are contained in sub-paragraph 2 of article 3, which reads as follows:

"The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of erecting temporary buildings for curing them; . . ."

All Indian treaties are construed liberally by our courts, in good faith and in favor of the Indians, because of the dominant position of the United States. *Worcester v. Georgia,* 31 U. S. 515, 8 L. Ed. 483; *United States v. Kagama,* 118 U. S. 375, 30 L. Ed. 228, 6 S. Ct. 1109; *Choctaw Nation v. United States,* 119 U. S. 1, 30 L. Ed. 306, 7 S. Ct. 75; *Jones v. Meehan,* 175 U. S. 1, 44 L. Ed. 49, 20 S. Ct. 1; *United States v. Winans,* 198 U. S. 371, 49 L. Ed. 1089, 25 S. Ct. 662.

In the *Worcester* case, *supra,* the supreme court of the United States said:

"The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense. To contend, that the word 'allotted,' in reference to the land guaranteed to the Indians, in certain treaties, indicates a favor conferred, rather than a right acknowledged, would, it would seem to me, do injustice to the understanding of the parties. *How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.*

"The question may be asked, is no distinction to be made between a civilized and savage people? Are our Indians to be placed upon a footing with the nations of Europe, with whom we have made treaties? The inquiry is not, what station shall now be given to the Indian tribes in our country? but what relation have they sustained to us, since the commencement of our government? We have made treaties with them; and are those treaties to be disregarded on our part, because they were entered into with an uncivilized people? Does this lessen the obligation of such treaties? By entering into them, have we not admitted the power of this people to bind themselves, and to impose obligations on us?" (Italics mine.)

In the *Jones* case, *supra,* that court again announced the rule of construction in the following language:

"In construing any treaty between the United States and an Indian tribe, it must always (as was pointed out by the counsel for the appellees) be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is

drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and *that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.*" (Italics mine.)

Rights not expressly granted in treaties with the Indians are reserved by them. *Winters v. United States*, 207 U. S. 564, 52 L. Ed. 340, 28 S. Ct. 207. Having this rule in mind, let us view the situation surrounding the making of the treaty of 1855, entered into between the Federal government and various Indian tribes of the northwest, including the Yakimas, of which appellant is a member.

The meeting at which the treaty was arranged was held at the council grounds in Walla Walla valley. It started May 18, 1855, and ended June 11, 1855. Governor Isaac I. Stevens of the territory of Washington and General Joel Palmer of the territory of Oregon represented the United States government, and chiefs of the various tribes represented the Indians. Many speeches were made by those present, chiefly by Governor Stevens and General Palmer.

As a result of the treaty, 16,920 square miles of territory were ceded to the United States by the Indians and 1,233 square miles of land were retained by the Indians in two reservations.

Among other things, Governor Stevens told the Indians,

"We have near to our hearts the property of the Indians and the propositions to be made to you will prove it."

Speaking of the tracts to be retained by the Indians, he said:

"On each tract we wish to have one or more schools; we want on each tract one or more blacksmiths; one or more carpenters; one or more farmers; we want you and your children to learn to make ploughs, to learn to make waggons, and everything which you need in your house. We want your women and your daughters to spin, and to weave and to make clothes. We want to do this for a certain number of years.

"Then you the men will be farmers and mechanics, or you will be doctors and lawyers like white men; your women and your daughters will then teach their children, those who come after them to spin, to weave, to knit, to sew, and all the work of the house and lodges, you will have your own teachers, your own farmers, blacksmiths, wheelwrights and mechanics; besides this we want on each tract a saw mill and a grist mill."

At another time, he made the following statement concerning the care which the government would exercise in order to help the Indians:

"I have spoken of an agent, I will speak more. If we agree at the council we have many things to do for you; the agent will live with you and see that it is done; if you think we have not done our part go to the agent and tell him so, and he will see that we *do* do it. If we think you have not done your part the agent will go to the chiefs and say so frankly and arrange it with them; he will be your elder brother, and will see that you are not wronged, and that the bargain is carried out."

Again, he stated:

"If we make a Treaty with you and our Great Chief and his Council approves it, you can rely on all its provisions being carried out strictly. My heart is that it is wise for you to do so. I will not speak any longer."

Governor Stevens made a definite statement relative to the Indian's right to fish in the following words:

"There is plenty of salmon on these reservations, there are roots and berries. There is also some game. You will be near the Great Road and can take your horses and your cattle down the river and to the Sound to market. . . .

"You will be allowed to go to the usual places and fish in common with the whites . . . together with all outside the reservation."

"In the paper for the Yakamas we have included the tribes who acknowledge Kam-i-ah-kan for their head chief. The Piscouse, the Swan-wap-um and Palouse, the Yakamas and all the bands on the Columbia below the Walla Walla down to the White Salmon River. They have their reservation and fishing stations, which they well know and which I understand is satisfactory. . . .

"You will not be called according to the paper to move on the reservation for two or three years; then is secured to you your right to fish, to get roots and berries, and to kill game; then your payments are secured to you as agreed; then your schools, your shops, and physicians and other things we have promised are secured; then the salaries, the houses and the 10-acre farms of your chiefs are secured to him. . . .

"I will ask of Looking Glass whether he has been told of our Council. Looking Glass knows that in this reservation settlers cannot go, that he can graze his cattle outside of the reservation on lands not claimed by settlers, *that he can catch fish at any of the fishing stations.* . . ." (Italics mine.)

All of these statements were made in good faith by Governor Stevens at a time when the northwest was very much of a wilderness. They were made at a time when Indians and white men alike hunted and fished as they desired without let or hindrance from the Federal or territorial governments. Regulations of fish and game were neither known nor dreamed of. The Indians had from time immemorial fished for salmon on the banks of the Columbia river. The catch-

ing of salmon was necessary for the sustenance of themselves and their families. Neither Governor Stevens nor the Indian chiefs could possibly have visualized present day conditions and present day restrictions. They entered into the treaty agreement under situations which existed at that time. We should interpret and construe the treaty and the rights of appellant in the light of the surroundings present at that time.

Without any doubt whatever, Governor Stevens and the Indians signed the treaty with the definite understanding that the Indians should be forever allowed to catch salmon from the Columbia river without any restrictions whatsoever. We should so construe the treaty.

It may be conceded that there is an ambiguity contained in the treaty. However, that ambiguity, if there is one, should be resolved in favor of the Indians. *Winters v. United States,* 207 U. S. 564, 52 L. Ed. 340, 28 S. Ct. 207.

The state is not in a position, nor does it have the power, to modify or abrogate a treaty made by authority of the Congress of the United States. Article I, § 8, of the Federal constitution, gives to the Congress power

"To regulate commerce with foreign nations and among the several states and with the Indian tribes."

The Enabling Act, 1 Rem. Rev. Stat., 333, § 4, Second, recognized the position of the state in disclaiming all title to all lands

". . . owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States."

There is a definite procedure insisted upon by the courts when the United States seeks to assert its position of dominance by abrogating or changing an Indian treaty, and that is by the passage of a clear and express act of Congress which is of such a nature that the treaty and the act cannot in any reasonable view stand together. *Cope v. Cope,* 137 U. S. 682, 34 L. Ed. 832, 11 S. Ct. 222; *Fong Yue Ting v. United States,* 149 U. S. 698, 37 L. Ed. 905, 13 S. Ct. 1016.

I realize that the majority opinion is founded upon the following decisions of this court: *State v. Towessnute,* 89 Wash. 478, 154 Pac. 805; *State v. Alexis,* 89 Wash. 492, 154 Pac. 810, 155 Pac. 1041; *State v. Meninock,* 115 Wash. 528, 197 Pac. 641; and *State v. Wallahee,* 143 Wash. 117, 255 Pac. 94.

The last three cases cited are based upon the holding in the *Towessnute* case, *supra.* To my mind, that case is entirely wrong in principle, and is founded upon an unjust assumption. It states that the Indians are mere occupants of the soil of America. Not so, they owned it as much or more than we do. Our ancestors took the lands from the Indians by conquest because they had firearms and were better able to destroy than the Indians.

Again, the opinion states, in speaking of the words "in common with citizens":

"These words were not used to give something to the white man, but to give something to the red man; not to give the Indian an advantage, but to save him from disadvantage."

Where did the white man get the land to give? The answer is that all of his rights were derived from the Indians. *United States v. Winans,* 198 U. S. 371, 49 L. Ed. 1089, 25 S. Ct. 662. The Indians surrendered their land to the white man in consideration of glowing promises of care and protection. When he gave

his land away, the red man reserved certain rights, among which was the right to fish at accustomed places, a right he had exercised for many, many generations.

It must be said, however, that at the time our former cases were decided, the court did not have the benefit of a report of the proceedings which led to the signing of the treaty under consideration.

The proper disposition of the question and interpretation of the treaty in question was made by the United States Supreme Court in *United States v. Winans, supra.* That court held that the Yakima Indians had a right in the real property, and an easement for certain express purposes in and to their usual and accustomed fishing places on the Columbia river. The court stated:

"The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed. ˙New conditions came into existence, to which those rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away. *In other words, the treaty was not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted.* And the form of the instrument and its language was adapted to that purpose. Reservations were not of particular parcels of land, and could not be expressed in deeds as dealings between private individuals. The reservations were in large areas of territory and the negotiations were with the tribe. They reserved rights, however, to every individual Indian, as though named therein. They imposed a servitude upon every piece of land as though described therein. There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved 'in common with citizens of the Territory.' As a mere right, it was not exclusive in the Indians. Citizens might share it,

but the Indians were secured in its enjoyment by a special provision of means for its exercise. They were given 'the right of taking fish at all usual and accustomed places,' and the right 'of erecting temporary buildings for curing them.' The contingency of the future ownership of the lands, therefore, was foreseen and provided for—in other words, the Indians were given a right in the land—the right of crossing it to the river—the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty. *And the right was intended to be continuing against the United States and its grantees as well as against the State and its grantees."* (Italics mine.)

Cf. *United States v. Powers,* 16 Fed. Supp. 155; *United States v. Stotts,* 49 F. (2d) 619; *United States v. McGowan,* 62 F. (2d) 955.

The cases of *State v. Towessnute, State v. Alexis, State v. Meninock,* and *State v. Wallahee, supra,* should be reexamined and overruled.

If Governor Stevens was not sincere and the government secured from the Indians the large domain ceded to it by the making of promises it did not intend to keep, and did not keep, then fraud was practiced on the Indians, and the wrong done to them should be rectified. On the other hand, if the promises made by Governor Stevens were made in good faith, as I am sure they were, then all of the facts relative to the making of the treaty should be considered in arriving at the intent of the parties.

The treaty should be upheld as construed in the *Winans* case, *supra,* and the judgment of the trial court reversed.

MILLARD and BLAKE, JJ., concur with SIMPSON, J.