## UNITED STATES *v.* NEW YORK INDIANS.

### APPEAL FROM THE COURT OF CLAIMS.

No. 697. Submitted January 30, 1899. — Decided March 20, 1899.

After the hearing of the former appeal in this case, 170 U. S. 1, and after the decree of this court determining the rights of the parties, and remanding the case to the Court of Claims with instructions to enter a new judgment for the net amount actually received by the Government for the Kansas lands, without interest, less the amount of lands upon the basis of which settlement was made with the Tonawandas, and other just deductions, etc., and after the Court of Claims had complied with this mandate, in accordance with its terms, a motion on the part of the United States to this court to direct the Court of Claims to find further facts comes too late.

As the judgment of the Court of Claims now appealed from was in exact accordance with the mandate of this court, the appeal from it is dismissed.

THIS case arose from a motion by the Indians to dismiss the appeal of the United States for want of jurisdiction, or, in the alternative, to affirm the judgment of the Court of Claims, upon the ground that the question involved is so frivolous as not to need further argument; and also from a counter motion by the United States for an order upon the Court of Claims to make a further finding of facts.

By an act of Congress, passed January 28, 1893, c. 52, 27 Stat. 426, the Court of Claims was authorized to hear and determine, and to enter up judgment upon the claims of the Indians " who were parties to the treaty of Buffalo Creek, New York," of January 15, 1838, to enforce an alleged liability of the United States for the value of certain lands in Kansas, set apart for these Indians and subsequently sold by the United States, as well as for certain amounts of money agreed to be paid upon their removal.

In its findings of fact the Court of Claims decided that the Indians described in the jurisdictional act, above referred to as " the New York Indians, being those Indians who were parties to the treaty of Buffalo Creek, New York, on the 15th of January, 1838, were the following : Senecas, Onondagas, Onondagas residing on the Seneca reservation, Onondagas at Onondaga, Cayugas, Cayugas residing on the Seneca reservation, Cayuga Indians residing in the State of New York, Tuscaroras, Tuscaroras residing in the State of New York, Oneidas residing in New York, at Green Bay, (Wisconsin,) and in the Seneca reservation, Oneidas, St. Regis, St. Regis in New York, the American party of the St. Regis residing in the State of New York, Stockbridges, Munsees, Brothertowns."

Upon the whole case, however, the Court of Claims found as a conclusion of law from the facts that the Indians had abandoned their claim, and accordingly dismissed their petition. On appeal to this court, under the act of Congress above mentioned, the judgment of the Court of Claims was reversed, 170 U. S. 1, this court being of opinion:

1. That the title acquired by the Indians under the treaty was a grant *in præsenti* of a legal title to a defined tract, described by metes and bounds, containing 1,824,000 acres in the now State of Kansas;

2. That there was no uncertainty as to the land granted or as to the identity of the grantees;

3. That the tribes for whom the Kansas lands were intended as a future home were the Senecas, Onondagas, Cayugas, Tuscaroras, Oneidas, St. Regis, Stockbridges, Munsees and Broth-

ertowns, residing in the State of New York, as found in the first finding of fact by the Court of Claims;

4. That the grant to the Indians was of the entire tract as specified in article two of the treaty, and not an allotment to them of 320 acres for each emigrant;

5. That the Government had received the full consideration stipulated by the treaty, so far as such consideration was a valuable one for the Kansas lands, and had neglected to render any account of the same;

6. That the Indians had neither forfeited nor abandoned their interest in the Kansas lands, and that they were entitled to a judgment.

Thereupon the case was remanded to the Court of Claims with instructions "to enter a new judgment for the net amount actually received by the Government for the Kansas lands, without interest, less any increase in value attributable to the fact that certain of these lands were donated for public purposes, as well as the net amount which the court below may find could have been obtained for the lands otherwise disposed of, if they had all been sold as public lands, less the amount of land upon the basis of which settlement was made with the Tonawandas, and less 10,240 acres allotted to the thirty-two New York Indians as set forth in finding 12, together with such deductions as may seem to the court below to be just, and for such other proceedings as may be necessary and in conformity with this opinion."

In obedience to this mandate the Court of Claims on November 14, 1898, made certain further findings of fact, set forth in the margin,[1] and as a conclusion of law decreed

---

[1] *Findings.*

Assuming that the claimants were entitled to 1,824.000 acres of land under the treaty of January 15, 1838, the court finds that of these lands the defendants sold 84,453.29 acres, for which they received the sum of $1.25 per acre. They otherwise disposed of the balance of said lands in granting the same for public purposes, and for the lands disposed of for public purposes they could have obtained the sum of $1.25 per acre.

The land at $1.25 per acre amounts to the sum of $2,280,000. The court in finding that the defendants could have sold the land at $1.25 does not take into consideration any increased value given to such lands because of

that the claimants recover from the United States the sum of $1,967,056; whereupon the United States took this appeal, and now move the court that the Court of Claims be ordered to further find and certify to this court:

"First. What constituted the Onondagas at Onondaga, Oneidas at Green Bay, Stockbridges, Munsees and Brother-towns, parties to the treaty of Buffalo Creek, as proclaimed April 4, 1840;

"Second. Whether or not the Oneidas at Green Bay, Stock-bridges, Munsees and Brothertowns resided in the State of

---

any donation of land for public purposes; and the court finds that the price at which the defendants sold the land was not increased because of any donation of other lands for public purposes. The court finds that the cost and expense of surveying and platting said lands was the sum of $45,600. The court finds that the number of acres allowed the Tonawanda band of the claimants in the settlement of their claim was 208,000 acres, which, at the price of $1.25 per acre, less the proportionate cost and expense of survey-ing and platting, amounts to the sum of $254,800. The number of acres allotted to the 32 Indians as set forth in finding twelve was 10,340 acres, which, at the rate of $1.25 per acre, less the proportionate cost and expense of surveying and platting, amounts to $12,544.

The court further finds that, after deducting the costs and expense of sur-veying and platting said lands, the amount paid by the defendants in the settlement with the Tonawanda band and the value of the allotment to the 32 Indians, there remains of said $2,280,000 the sum of $1,967,056.

The court further finds: The New York Indians who were parties to the treaty of Buffalo Creek of 1838, as amended and proclaimed, were the fol-lowing:

| | |
|---|---:|
| Senecas | 2309 |
| Onondagas on Senecas' reservation | 194 |
| Cayugas | 130 |
| | 2633 |
| Onondagas at Onondaga | 300 |
| Tuscaroras | 273 |
| Saint Regis in New York | 350 |
| Oneidas at Green Bay | 600 |
| Oneidas in New York | 620 |
| Stockbridges | 217 |
| Munsees | 132 |
| Brothertowns | 360 |
| Total | 5485 |

New York when the treaty of Buffalo Creek was proclaimed, or when they became parties thereto."

*Mr. Solicitor General, Mr. Assistant Attorney General Pradt* and *Mr. Charles C. Binney* for the United States.

*Mr. Jonas H. McGowan* and *Mr. Guion Miller* for the New York Indians.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

As a disposition of either one of these motions will practically dispose of the other, both may properly be considered together.

The preamble to the treaty of Buffalo Creek of January 28, 1838, 7 Stat. 550, recites that "the following articles of a treaty are entered into between the United States of America and the several tribes of the New York Indians, the names of whose chiefs, headmen and warriors are hereto subscribed, and those who may hereafter assent to this treaty in writing, within such time as the President shall appoint." The second article of the treaty also recites that " it is understood and agreed that the above described country " (the land ceded) " is intended as a future home for the following tribes, to wit: The Senecas, Onondagas, Cayugas, Tuscaroras, Oneidas, St. Regis, Stockbridges, Munsees and Brothertowns residing in the State of New York, and the same is to be divided equally among them according to their respective numbers, as mentioned in the schedule hereunto annexed." The treaty purports to be signed by the headmen of the Senecas, Tuscaroras, Oneidas residing in the State of New York as well as at Green Bay, St. Regis, Onondagas residing on the Seneca reservation, the principal Onondaga warriors, Cayugas and the principal Cayuga warriors ; but the schedule, immediately following the signatures, contains also the names of the Stockbridges, Munsees and Brothertowns. The commissioner on behalf of the United States certifies that this schedule was made before the execu-

tion of the treaty. Following this there are certain certificates by the commissioner to the effect that the treaty was assented to by the Senecas, Tuscaroras, St. Regis, Oneidas, Cayugas and Onondagas. On January 22, 1839, the President sent the treaty to the Senate with the following message:

" To the Senate of the United States:

"I transmit a treaty negotiated with the New York Indians which was submitted to your body in June last and amended.

" The amendments have, in pursuance of the requirement of the Senate, been submitted to each of the tribes assembled in council, for their free and voluntary assent or dissent thereto. In respect to all the tribes, except the Senecas, the result of this application has been entirely satisfactory. It will be seen by the accompanying papers that of this tribe, the most important of those concerned, the assent of forty-two out of eighty-one chiefs has been obtained. I deem it advisable, under the circumstances, to submit the treaty in its modified form to the Senate for its advice in regard to the sufficiency of the assent of the Senecas to the amendment proposed.

"(Signed)     M. VAN BUREN.

" Washington, 21st January, 1839."

The assent of the Senecas having been procured, the treaty was afterwards ratified.

The question was thus presented to the Court of Claims whether the Stockbridges, Munsees and Brothertowns — who did not actually sign the treaty — gave their assent, and the Court of Claims found as a fact that they were actually parties to it. There was certainly some evidence in support of this finding which also accorded with the opinion of this court in *Fellows* v. *Blacksmith*, 19 How. 366, 372, in which an objection was taken on the argument to the validity of the treaty, on the ground that the Tonawanda band of the Seneca Indians was not represented by the chief and headmen of the band in the negotiations and execution of it. "But," said the court, " the answer to this is, that the treaty, after executed and

ratified by the proper authorities of the Government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation than they can behind an act of Congress."

But we are now asked to direct the Court of Claims to find:

First. What constituted the Onondagas at Onondaga, Oneidas at Green Bay, Stockbridges, Munsees and Brother-towns parties to the treaty of Buffalo Creek, as proclaimed April 4, 1840?

Second. Whether or not the Oneidas at Green Bay, Stockbridges, Munsees and Brothertowns resided in the State of New York when the treaty of Buffalo Creek was proclaimed, or when they became parties thereto?

But if these be material facts, they were equally so when the findings were made at the first hearing, and the attention of the court should have been called to the matter, and a more particular finding requested. The motion contemplates an order upon the court to send up the testimony upon which it had found the ultimate fact that these three tribes were parties to the treaty, and inferentially for us to pass upon the sufficiency of that testimony to establish such ultimate fact. If the finding of these probative facts were deemed material within the case of *United States* v. *Pugh*, 99 U. S. 265, application should have been made when the case was first sent here for a finding of such facts. In the *Pugh case* the Court of Claims found certain circumstantial facts, and the question this court was called upon to decide was whether those facts were sufficient to support the judgment. But this court did not hold that, where the Court of Claims was satisfied that the evidence before it fully established a fact, it was bound to insert all the evidence upon that point, if the losing party thought the court made a mistake. This court has repeatedly held that the findings of the Court of Claims in an action at law determines all matters of fact, like the verdict of a jury, and that where there is any evidence of a fact which they find, and no exception is taken, their finding is final; *Stone* v. *United States*, 164 U. S. 380; *Desmare* v. *United States*, 93

U. S. 605 ; *Talbert* v. *United States,* 155 U. S. 45 ; and in *McClure* v. *United States,* 116 U. S. 145, this court distinctly held that it would not remand a case to the Court of Claims with directions to return whether certain distinct propositions, in requests for findings of fact, presented to that court at the trial of the case, were established and proved by the evidence, if it appeared that the object of the request to have it so remanded was to ask this court to determine questions of fact upon the evidence.    In *The Santa Maria,* 10 Wheat. 431, 444, it was said by Mr. Justice Story : " We think, therefore, that upon principle every existing claim which the party has omitted to make at the hearing upon the merits, and before the final decree, is to be considered as waived by him, and is not to be entertained in any future proceedings ; and when a decree has been made, which is in its own terms absolute, it is to be carried into effect according to those terms, and excludes all inquiry between the litigating parties as to liens or claims which might have been attached to it by the court, if they had been previously brought to its notice."    See also *Hickman* v. *Fort Scott,* 141 U. S. 415.

But it is difficult to see how the proposed findings, if made, could be deemed material.    This court held that the treaty of Buffalo Creek was a grant *in præsenti* of a certain tract of land in Kansas, described by metes and bounds.    The second article of the treaty indicates that the grant was made upon the basis of 320 acres for each inhabitant, the recital " being 320 acres for each soul of said Indians as their numbers are at present computed."    But the grant was not of 320 acres for each soul, but of a tract of land *en bloc.*    Under the decision of the court a present title thereto passed to the Indians.    This being the case, the United States are in no position to show that the Government erred in its computation of souls, or that certain tribes who are named in the treaty did not assent to it. If the land passed under the treaty, then it is only a question between the Indians themselves who were signatories thereto or assented to its terms.    The only object of the proposed order, though it is but faintly outlined in the briefs, must be to show that if the Stockbridges, Munsees and Brothertowns

never assented to the treaty, the grant should be reduced in the proportion of 320 acres to each member of these tribes. But this is an indirect attack upon the decree. The case was remanded to the Court of Claims, not to determine who were actually parties to the treaty, or to recompute the number of souls, or in any other way to reduce the extent of the grant, but to render a judgment for the amount received by the Government for the Kansas lands, less an amount of lands upon the basis of which settlement had been made with the Tonawandas, and less the 10,240 acres allowed to thirty-two New York Indians, "together with such other deductions as may seem to the court below to be just." But there is nothing to indicate that the Court of Claims was at liberty to redetermine who were parties to the treaty, and entitled to the benefit of its provisions. That question had already been settled beyond recall. The motion for additional findings must therefore be denied.

The denial of this motion practically disposes of the appeal, as the action of the court below in its supplemental findings was in strict conformity with the mandate of this court. It found the amount of land sold by the United States, the cost and expense of surveying and platting said lands, the number of acres allowed to the Tonawanda band, the number allotted to the thirty-two Indians, and, after deducting the expense of surveying and platting, the amount paid by the United States in settlement of the Tonawanda band and thirty-two Indians, there remained of the value of the land at $1.25 per acre the sum of $1,967,056. The court further found who the New York Indians were, who were parties to the treaty, and as a conclusion of law judgment was entered for the above amount. This court has repeatedly held that a second writ of error does not bring up the whole record for reëxamination, but only the proceedings subsequent to the mandate, and if those proceedings are merely such as the mandate command, and are necessary to its execution, the writ of error will be dismissed, as any other rule would enable the losing party to delay the issuing of the mandate indefinitely. *The Santa Maria,* 10 Wheat. 431; *Roberts* v. *Cooper,* 20 How. 467; *Tyler* v. *Magwire,* 17

Wall. 253; *The Lady Pike*, 96 U. S. 461; *Supervisors* v. *Kennicott*, 94 U. S. 498; *Stewart* v. *Salamon*, 97 U. S. 361.

In *Stewart* v. *Salamon, supra,* Mr. Chief Justice Waite observed: "An appeal will not be entertained by this court from a decree entered in the Circuit or other inferior court, in exact accordance with our mandate upon a previous appeal. Such a decree, when entered, is in effect our decree, and the appeal would be from ourselves to ourselves. If such an appeal is taken, however, we will, upon the application of the appellee, examine the decree entered, and if it conforms to the mandate, dismiss the case with costs. If it does not, the case will be remanded with proper directions for the correction of the error. The same rule applies to writs of error." *Humphrey* v. *Baker*, 103 U. S. 736; *Clark* v. *Keith*, 106 U. S. 464; *Mackall* v. *Richards*, 116 U. S. 45.

The appeal will therefore be

*Dismissed.*

The CHIEF JUSTICE, MR. JUSTICE HARLAN and MR. JUSTICE BREWER dissented.