50 Wn.2d 513 (1957)
314 P.2d 400
THE STATE OF WASHINGTON, Appellant,
v.
ROBERT SATIACUM et al., Respondents.[1]
No. 33545.
The Supreme Court of Washington, En Banc.
July 1, 1957.
John J. O'Connell, John A. Petrich, Keith D. McGoffin, and John G. McCutcheon, for appellant.
Malcom Stewart McLeod and Wing C. Luke, for respondents.
John J. O'Connell, Joseph T. Mijich, Nathan G. Richardson, Arthur Lazarus, Jr., and Theodore H. Little, amici curiae.
DONWORTH, J.
The only question presented on this appeal involves the right of defendants, who are Puyallup Indians, to fish on the Puyallup river during the closed season (1) within the exterior boundaries of the original Puyallup Indian reservation, and (2) "at all usual and accustomed fishing grounds and stations" under the treaty of Medicine Creek of 1855. 10 Stat. 1132.
Defendants were jointly charged by amended complaint in justice court with five counts of illegal fishing, alleged to have occurred on November 10 and 11, 1954, on the Puyallup river in Pierce county.
The acts alleged to be contrary to statute were (1) use of a net for the purpose of catching food fish (salmon), contrary to the provisions of RCW 75.12.060; (2) use of a net *514 for the purpose of catching game fish (steelhead), contrary to the provisions of RCW 77.16.060; (3) possession of game fish during the closed season, contrary to the provisions of RCW 77.16.030 and rules and regulations promulgated by the state game commission under authority of RCW 77.12.010 et seq.; and (4) possession of food fish during the closed season, contrary to rules and regulations promulgated by the director of fisheries under authority of RCW 75.08.010 et seq.
After trial in justice court, James Young was found guilty on four counts, and Robert Satiacum was found guilty on two counts. They appealed to the superior court of Pierce county, and following a trial de novo, the court entered a judgment of dismissal, stating, in part, as follows:
"IT IS ORDERED, ADJUDGED and DECREED that the within cause be and hereby is dismissed as to each count for want of sufficient evidence, it appearing from the oral stipulation herein that the defendants are Puyallup Indians, that they claim fishing rights under the Treaty of Medicine Creek of 1855, and that the acts herein took place at a usual and accustomed fishing ground of the Puyallup Indians, and the State having failed to introduce any evidence that as to Puyallup Indians the statutes and regulations herein involved were reasonable and necessary for the conservation of fish."
Briefly stated, the events which led to the arrest of respondents are as follows:
On November 10, 1954, law enforcement officers observed James Young tending two fixed nets located on the Puyallup river within the city limits of Tacoma. The law enforcement officers testified that on that date Mr. Young had two salmon in his possession, but they did not arrest him.
On November 11, 1954, these same officers observed both defendants on the same location tending the two nets. The officers testified that defendants had three steelhead fish in their possession on this date, at which time defendants were arrested.
The parties stipulated that there is in full force and effect the treaty of Medicine Creek of 1855, a valid treaty between the Medicine Creek tribes and the United States; that the *515 Puyallup Indian tribe is one of the Medicine Creek tribes and a signator to the treaty of 1855; that the defendants in this action are descendants of the original Puyallup tribe of Indians and are presently on the rolls of the Puyallup tribe of Indians, a tribe recognized by the secretary of the interior and the bureau of Indian affairs as a regular, organized Indian tribe under the Wheeler-Howard act of 1934, as amended (25 U.S.C. §§ 461-479); that the "lower river net" was located inside the original Puyallup Indian reservation, established by treaty with the United States, but that the land on each side of the river had been alienated by the Puyallup Indians; and that the "upper river net" was at a usual and accustomed fishing ground of the Puyallup tribe of Indians, as defined by the treaty.
In dismissing the cause, the trial court based its decision upon the recent case of Makah Indian Tribe v. Schoettler, 192 F. (2d) 224 (C.A. 9th), wherein it was held that the state of Washington had failed to sustain the burden of proving that the regulation there in question was reasonable and necessary for the conservation of fish.
The state has appealed from the trial court's dismissal of the charges. Its sole assignment of error is directed to
"The dismissal of the case as to each count for want of sufficient evidence as to the reasonableness and necessity of the statutes and regulations involved for the conservation of fish."
Respondents contend that, while the Makah case is authority for sustaining the judgment of the trial court, the real issue presented for decision is whether the police power of the state, as expressed in the statutes above referred to, can impair the rights guaranteed to the Indians under the treaty of She-Nah-Nam or Medicine Creek of 1855.
This treaty is one of several treaties entered into by Territorial Governor Isaac I. Stevens, as representative of the United States, and the Indian tribes in the Washington territory following its creation. As a result of the Medicine Creek treaty, a vast territory was "ceded" to the United States by the Indians, and a small tract of land extending *516 inward from the mouth of the Puyallup river was retained by the Indians as a reservation.
Article III of the treaty provides as follows:
"The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands: ..." (Italics ours.) 10 Stat. 1132.
Since our decision in this case turns upon the proper construction of this article of the treaty, and since the supreme court of the United States is the only tribunal having the power to interpret authoritatively the United States constitution and treaties made thereunder, we find it necessary to review its decisions relating to the construction of Indian treaties.
All Indian treaties entered into prior to 1871 were consummated pursuant to Art. II, § 2 of the United States constitution. Article VI, commonly referred to as the "supremacy clause," provides:
"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." (Italics ours.)
The supreme court has consistently held that Indian treaties have the same force and effect as treaties with foreign nations, and consequently are the supreme law of the land and are binding upon state courts and state legislatures notwithstanding state laws to the contrary. Cherokee Nation v. Georgia, 5 Pet. (U.S.) 1, 8 L.Ed. 25; Worcester v. Georgia, 6 Pet. (U.S.) 515, 8 L.Ed. 483; Blue Jacket v. Johnson County Commissioners (Kansas Indians), 5 Wall. (U.S.) 737, 18 L.Ed. 667; Holden v. Joy, 17 Wall. (U.S.) 211, 21 L.Ed. 523; United States v. New York Indians, 173 U.S. 464, 43 L.Ed. 769, 19 S.Ct. 487; Jones v. Meehan, 175 U.S. 1, 44 L.Ed. 49, 20 S.Ct. 1; Choctaw Nation v. United *517 States, 179 U.S. 494, 45 L.Ed. 291, 21 S.Ct. 149; United States v. Winans, 198 U.S. 371, 49 L.Ed. 1089, 25 S.Ct. 662. See, also, 4 A.L.R. 1380, 134 A.L.R. 882-888, 11 Am. Jur. 650, § 43, 27 Am. Jur. 548, § 10.
In the Worcester case, supra, the state of Georgia had attempted to prosecute a missionary who had gone upon the Cherokee Indian reservation with the permission of the tribal council, but contrary to a state statute. The supreme court, speaking through Chief Justice Marshall, stated, in part, as follows:
"The Indian nations had always been considered as distinct, independent, political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial, with the single exception of that imposed by irresistible power, which excluded them from intercourse with any other European potentate than the first discoverer of the coast of the particular region claimed; and this was a restriction which those European potentates imposed on themselves, as well as on the Indians. The very term `nation,' so generally applied to them, means `a people distinct from others.' The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently, admits their rank among those powers who are capable of making treaties. The words `treaty' and `nation', are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well-understood meaning. We have applied them to Indians, as we have applied them to the other nations of the earth; they are applied to all in the same sense." (Italics ours.)
The statute was held void, since it conflicted with the Cherokee Indian treaty, which was declared to be the supreme law of the land.
In the case of Missouri v. Holland, 252 U.S. 416, 64 L.Ed. 641, 40 S.Ct. 382, 11 A.L.R. 984, the supreme court construed a treaty between the United States and Great Britain which had been executed in an effort by the two nations to conserve migratory waterfowl known to traverse many parts of the United States and Canada in their annual migrations. *518 Subsequently, Congress had enacted the migratory bird treaty act of July 3, 1918, and the state brought a bill in equity to prevent a United States game warden from attempting to enforce the statute and regulations made pursuant thereto. The argument was advanced by the state of Missouri that the treaty infringed upon the constitution, was void as an interference with the rights reserved to the states by the tenth amendment, and that the acts of the United States, pursuant to the treaty, invaded the sovereign and plenary right of the state to regulate and conserve wildlife and contravened its will manifested in statutes. The supreme court, speaking through Justice Holmes, stated:
"To answer this question it is not enough to refer to the Tenth Amendment, reserving the powers not delegated to the United States, because by Article II, § 2, the power to make treaties is delegated expressly, and by Article VI treaties made under the authority of the United States, along with the Constitution and laws of the United States made in pursuance thereof, are declared the supreme law of the land....
"As most of the laws of the United States are carried out within the States and as many of them deal with matters which in the silence of such laws the State might regulate, such general grounds are not enough to support Missouri's claim. Valid treaties of course `are as binding within the territorial limits of the States as they are elsewhere throughout the dominion of the United States.' ...
"We are of opinion that the treaty and statute must be upheld." [Citing case.] (Italics ours.)
(The statute referred to was the act of Congress passed to implement the treaty.)
In the case of Asakura v. Seattle, 265 U.S. 332, 68 L.Ed. 1041, 44 S.Ct. 515, the supreme court construed a treaty with Japan, and stated:
"A treaty made under the authority of the United States `shall be the supreme law of the land; and the judges in every State shall be bound thereby, any thing in the constitution or laws of any State to the contrary notwithstanding.' Constitution, Art. VI, § 2.
"The treaty-making power of the United States is not limited by any express provision of the Constitution, and, though it does not extend `so far as to authorize what the *519 Constitution forbids,' it does extend to all proper subjects of negotiation between our government and other nations. Geofroy v. Riggs, 133 U.S. 258, 266, 267; In re Ross, 140 U.S. 453, 463; Missouri v. Holland, 252 U.S. 416. The treaty was made to strengthen friendly relations between the two nations. As to the things covered by it, the provision quoted establishes the rule of equality between Japanese subjects while in this country and native citizens. Treaties for the protection of citizens of one country residing in the territory of another are numerous, and make for good understanding between nations. The treaty is binding within the State of Washington. [Citing case.] The rule of equality established by it cannot be rendered nugatory in any part of the United States by municipal ordinances or state laws. It stands on the same footing of supremacy as do the provisions of the Constitution and laws of the United States. It operates of itself without the aid of any legislation, state or national; and it will be applied and given authoritative effect by the courts. [Citing cases.]" (Italics ours.)
A Seattle municipal ordinance, which purported to prevent citizens of Japan from engaging in the pawnbroking business, was held invalid, since it conflicted with the Japanese treaty.
In the case of Nielsen v. Johnson, 279 U.S. 47, 73 L.Ed. 607, 49 S.Ct. 223, the supreme court construed a treaty with Denmark and stated:
"Treaties are to be liberally construed so as to effect the apparent intention of the parties. [Citing cases.] When a treaty provision fairly admits of two constructions, one restricting, the other enlarging rights which may be claimed under it, the more liberal interpretation is to be preferred, [citing cases] and as the treaty-making power is independent of and superior to the legislative power of the states, the meaning of treaty provisions so construed is not restricted by any necessity of avoiding possible conflict with state legislation and when so ascertained must prevail over inconsistent state enactments." (Italics ours.)
The court held invalid an Iowa inheritance tax statute, which purported to levy a discriminatory tax on property inherited by a citizen of Denmark, because it violated the treaty provisions.
*520 All Indian treaties are construed by the courts in favor of the Indians, in an endeavor to exercise toward them the highest degree of good faith, because of the dominant position of the United States. Worcester v. Georgia, supra; Holden v. Joy, supra; Jones v. Meehan, supra; United States v. Kagama, 118 U.S. 375, 30 L.Ed. 228, 6 S.Ct. 1109; United States v. Winans, supra; Seufert Bros. Co. v. United States, 249 U.S. 194, 63 L.Ed. 555, 39 S.Ct. 203; United States v. Shoshone Tribe, 304 U.S. 111, 82 L.Ed. 1213, 58 S.Ct. 794; Tulee v. Washington, 315 U.S. 681, 86 L.Ed. 1115, 62 S.Ct. 862; State v. Arthur, 74 Ida. 251, 261 P. (2d) 135; State v. McClure, 127 Mont. 534, 268 P. (2d) 629.
[1] Keeping in mind the rules of construction heretofore cited, and after reading and analyzing the above cited cases, and many others dealing with Indian treaties in relation to state legislation enacted under the police power, we have reached the conclusion that the better reasoned cases have held state legislation invalid as to the Indians where there was a conflict with treaty stipulations.
We are not here concerned with the plenary right vested in the state under its police power to enact general laws for regulation and conservation of wildlife, as this right has long been recognized where it does not invade rights protected by the United States constitution or a treaty. Frach v. Schoettler, 46 Wn. (2d) 281, 280 P. (2d) 1038; Geer v. Connecticut, 161 U.S. 519, 40 L.Ed. 793, 16 S.Ct. 600; Patsone v. Pennsylvania, 232 U.S. 138, 58 L.Ed. 539, 34 S.Ct. 281; State v. Tice, 69 Wash. 403, 125 Pac. 168.
The question presented here is whether the rights reserved to the Puyallup Indians by the treaty of Medicine Creek of 1855, and particularly Article III thereof (quoted above), render the Indians immune from the operation of the police power herein sought to be invoked by the state of Washington, when their treaty rights have never been extinguished by the United States. 25 U.S.C.A., Indians §§ 71, 478(b).
Appellant contends that the state has the power to regulate the time and manner of taking fish, in spite of a valid *521 treaty entered into by the United States and an Indian tribe, so long as the statutory rules and regulations are necessary for the conservation of fish, citing Tulee v. Washington, 315 U.S. 681, 86 L.Ed. 1115, 62 S.Ct. 862 (reversing State v. Tulee, 7 Wn. (2d) 124, 109 P. (2d) 280), and Ward v. Race Horse, 163 U.S. 504, 41 L.Ed. 244, 16 S.Ct. 1076.
The Tulee case involved the right of this state to enforce a regulation requiring the Yakima Indians to purchase a fishing license. The Yakima treaty of 1859 (12 Stat. 941) contained a clause similar to the one quoted above, and the state relied upon its broad police powers to uphold the licensing act. We held the act valid (State v. Tulee, supra), based largely upon the rationale of Ward v. Race Horse, supra; New York ex rel. Kennedy v. Becker, 241 U.S. 556, 60 L.Ed. 1166, 36 S.Ct. 705, and four of our earlier decisions; State v. Towessnute, 89 Wash. 478, 154 Pac. 805; State v. Alexis, 89 Wash. 492, 154 Pac. 810, 155 Pac. 1041; State v. Meninock, 115 Wash. 528, 197 Pac. 641, and State v. Wallahee, 143 Wash. 117, 255 Pac. 94. The supreme court of the United States reversed our decision in the Tulee case and held that, although the act was regulatory as well as revenue producing, the exaction of a fee as a prerequisite to fishing at the "usual and accustomed places" could not be reconciled with a fair construction of the Yakima treaty.
In the course of that opinion, the supreme court, speaking through Justice Black, stated
"... that, while the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish,[3] it forecloses the state from charging the Indians a fee of the kind in question here." (Italics ours.)
Footnote 3 cites the cases of New York ex rel. Kennedy v. Becker, supra, and United States v. Winans, supra.
While we believe that the language quoted is dictum, the inference contained therein, namely, that the state may enact regulations necessary for the conservation of fish and impose them equally upon the Indians who fish outside the *522 reservation at their "usual and accustomed places," is not applicable in the case at bar. This rationale originated in the Race Horse and Kennedy cases, supra. The Race Horse case denied the Bannock tribe of Wyoming its treaty-hunting right, based upon a repeal by implication. The Kennedy case denied the Seneca Indians of New York their "treaty" right to fish and hunt, unimpaired by state regulation, upon land conveyed by them to Robert Morris. The supreme court, in these two cases, held the right was not one existing against the state which it was bound to respect. These two cases are, therefore, distinguishable upon the ground either that the treaty provisions limited the Indians' reserved rights or that the Indians anticipated the future sovereign power to limit them.
In the case at bar, appellant does not contend that the treaty rights of the Puyallup Indians were repealed by implication in our enabling act. 25 Stat. 676. Cf. Tulee v. Washington, supra; State v. McClure, supra. Nor is it at all clear that the treaty limits the Indians' reserved rights. We conclude that the Race Horse and Kennedy cases are not controlling here.
In the Winans case, the court was concerned with an easement  not a state regulation. Therefore, the case is not authority for the proposition that the state may impose regulations against the Indians under the police power. However, the rules of construction announced therein are equally applicable in the instant case.
The argument frequently presented by the states (as in the case at bar) to the effect that general regulations may be imposed against the Indians equally with others, or in common with citizens, has been rejected by the courts. Tulee v. Washington, supra; State v. McClure, supra; State v. Arthur, supra; Makah v. Schoettler, supra.
We also believe that the language previously quoted from the Tulee case was intended to apply only to the factual situations in the cases from which that language was taken. This conclusion is justified because the supreme court, in that case, further stated:
*523 "In determining the scope of the reserved rights of hunting and fishing, we must not give the treaty the narrowest construction it will bear. In United States v. Winans, 198 U.S. 371, this Court held that, despite the phrase `in common with citizens of the Territory,' Article III conferred upon the Yakimas continuing rights, beyond those which other citizens may enjoy, to fish at their `usual and accustomed places' in the ceded area; and in Seufert Bros. Co. v. United States, 249 U.S. 194, a similar conclusion was reached even with respect to places outside the ceded area. From the report set out in the record before us, of the proceedings in the long council at which the treaty agreement was reached, we are impressed by the strong desire the Indians had to retain the right to hunt and fish in accordance with the immemorial customs of their tribes. It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people. United States v. Kagama, 118 U.S. 375, 384; Seufert Bros. Co. v. United States, supra, 198-199." (Italics ours.)
The courts have generally recognized that the treaty right of fishing at "usual and accustomed places" was given to the Indians to provide for their subsistence and as a means for them to earn a livelihood. United States v. Winans, supra; Makah v. Schoettler, supra; State v. McClure, supra. Applying a liberal  and not a strained  construction to the treaty of Medicine Creek as a whole, it is our opinion that the Puyallup Indians so understood Article III of the treaty, and that neither the Indians nor the United States intended that the states would or could enforce general regulations against the Indians "equally with others" or "in common with all citizens of the Territory" and thereby deprive them of their right to hunt and fish in accordance with the immemorial customs of their tribes. As we interpret the treaty, we believe that the phrase "in common with all citizens of the Territory" merely granted the white settlers and their heirs and/or grantees a right to fish at these places with the Indians, but that the Indians thereby reserved their right to fish at these places irrespective of *524 state regulation, so long as the right shall not have been abrogated by the United States.
No other conclusion would give effect to the treaty, since to hold that their right was equal to that of the citizens of the territory would be to say that they were given no right at all, except that which any citizen subject to state statutes and regulations may enjoy to fish at the "usual and accustomed grounds and stations." This interpretation would permit the state to abrogate their treaty rights at will.
We are convinced that, under the applicable decisions of the supreme court of the United States referred to herein, the statutes and regulations in the case at bar are in conflict with the treaty provisions, constitute an interference with matters that are within the exclusive scope of Federal power and, therefore, cannot be held valid as to the Puyallup Indians, in relation to their right to fish "at all usual and accustomed fishing grounds and stations."
The further contention is made by appellant that, since the Puyallup Indians have alienated certain lands bordering upon the Puyallup river (which were located within the exterior boundaries of the original Puyallup reservation), they have thus lost their treaty right to fish at those locations. There is nothing to indicate that their treaty right to fish in streams flowing through or bordering upon the reservation has been abrogated by the United States. This court, in the case of Pioneer Packing Co. v. Winslow, 159 Wash. 655, 294 Pac. 557, held that the state had no jurisdiction over the Indians, in so far as their right to fish in streams flowing through or bordering upon the reservation was secured to them by a treaty similar to the one above referred to. We are constrained to hold that alienation of the land which was, and is, within the original Puyallup reservation, and which borders upon the Puyallup river, does not alter the character of the right of the Indians to fish upon the river within the exterior boundaries of the original Puyallup Indian reservation, in view of the decision in the Pioneer Packing Co. case. Cf. United States v. Winans, supra; State v. McClure, supra.
*525 That the supreme court still adheres to the views expressed by it in the decisions hereinbefore cited, is indicated by its refusal to review the recent decision of the supreme court of Idaho in State v. Arthur, 74 Ida. 251, 261 P. (2d) 135. That decision is directly in point. In that case there was involved a prosecution of a Nez Perce Indian for violation of a state statute forbidding the killing of deer out of season. The killing was alleged to have taken place on land ceded to the Federal government by the Nez Perce tribe. The defendant demurred to the complaint, relying on the provisions of Article III of the Treaty of 1855, which reserved to the Indians the right to hunt on open and unclaimed land. The demurrer was sustained, and the action dismissed.
The state of Idaho appealed, and its supreme court affirmed the dismissal. In discussing the relative validity of the police power of the state and the treaty-making power of the United States, the court said:
"If the right exists in the State to regulate the killing of game upon open and unclaimed lands ceded by the Nez Perce Indians to the United States, it follows that such right is to be exercised under the police power of this state. Generally stated, the police power under the American constitutional system has been left to the states. It has been considered a power inherent in and always belonging to the states and not a power surrendered by the respective states to the federal government or by the federal government restricted under the United States Constitution. It is under this further general proposition that the State claims its source and scope of power to prohibit killing deer during certain times of the year in the interests of conservation of wild life. That the State has and may exercise such power generally is not the question; this power is limited in the enactment of laws and regulations to the extent that the same are not repugnant to any constitutional provisions of either the State or the Federal Constitution. Is the law and regulation as to a closed season repugnant to rights reserved under the Treaty of 1855?
"The Constitution of the United States does not contain any provisions which expressly limit the police power of any state; however, it does forbid the exercise of certain powers by the state under Art. 1, § 10, of the Federal Constitution, *526 including the inhibition against any state passing any laws impairing the obligation of contracts; moreover, Art. 6, cl. 2 of the Federal Constitution expressly declares that the Federal Constitution and the laws of the United States made in pursuance thereof, and all treaties made, or which shall be made, shall be the supreme law of the land, binding upon the judges in every state notwithstanding anything in the Constitution or laws of any state to the contrary. Hence the federal government is paramount and supreme within the scope of powers conferred upon it by the Constitution and it follows that a state must exercise its police power subject to constitutional limitations, if any; the statute of any state enacted pursuant to its police power which conflicts with any treaty of the United States constitutes an interference with matters that are within the exclusive scope of federal power and, hence, cannot be permitted to stand. 16 C.J.S., Constitutional Law, § 196, page 565; the treaty being superior to a particular state law and regulation, though the state law and regulation involved is otherwise within the legislative power of the state, the rights created under the treaty cannot thus be destroyed; this in effect holds the application of the statute in abeyance during the existence of the obligation of the treaty. 63 C.J., § 29, pp. 844-45. This recognizes the principle that the provisions of the United States Constitution shall elevate treaties of the federal government over state legislation though the state legislation appertains to the state police power. 11. Am. Jur., § 255, p. 987."
After discussing Tulee v. Washington, supra, and holding that the Race Horse and Kennedy-Becker cases had been rejected by the supreme court of the United States in subsequent decisions, the Idaho court continued:
"We are not here concerned with the general right vested in the State under its police power to enact reasonable laws for the conservation of wild life; this right has long been recognized and whenever it can be done without violating any organic act of the land or without invasion of rights protected by constitution or treaty, it is recognized. The question here is whether or not the pre-existing ancient Indian hunting rights which were reserved to them in the Treaty of 1855 may have attached to such rights the exercise of the police power of the State. It is primarily a question of whether or not the police power here sought to be invoked by the State ever has attached to or can apply to *527 such rights without the consent of such Indians or by positive act on the part of the federal government extinguishing the right which was reserved in the Indians and thus far has never passed from them to the people, to the state, or to the nation.
"One of the primary purposes of licensing in reference to fishing and hunting is to conserve wild life; the law is essentially a regulatory act rather than a revenue act. To exact a license under the claimed police power, which the Supreme Court of the United States held could not be done in the case of Tulee v. Washington, supra, and which the Supreme Court of Idaho held could not be done in the case of State v. McConville, [supra,] certainly would be less onerous upon the affected Indian tribes than the enactment of legislation under the claimed police power limiting the killing of game or prohibiting fishing in certain areas or doing either during certain times of the year. While both fishing and hunting are primarily sport and recreation for most fishermen and hunters, this is not so with respect to the Indians; they have always fished and hunted to obtain food and furs necessary for their existence and have been controlled as to the time when and the area where and the amount of catch or kill by the exigencies of the occasion; while no doubt this was more so in 1855 than it is now, the fact remains that it is to a lesser extent also true today; be that as it may, their rights reserved in this respect should be determined in the light of conditions existing at the time of the treaty and the manifest intent of all contracting parties at that time. Under the holding of the Tulee and McConville cases the Supreme Court of the United States in the first case and the Supreme Court of this state in the second case have definitely held that to exact a license fee from the Indians in order to fish, and I assume the same would be true with reference to hunting, could not be reconciled with the rights reserved under the treaty. The decision in each case was not premised on burden but upon principle; surely the exaction of a $2 fishing license would not unduly burden an Indian who desires to fish nor would it likely cause him to forego this reserved right. His rights of an equal, if not of a superior nature under the treaty to hunt upon open and unclaimed lands, because less restricted by the language of the treaty should upon principle and fair dealing be protected against state laws which limit him to hunt at certain times of the year in common with all other citizens. This would mean that at certain times of the year his otherwise ancient right recognized by the *528 treaty and never extinguished would for all practical purposes be extinguished. If the position of the State is sustained the assurance given by Governor Stevens that they could kill game when they pleased and the provision of the treaty reserving to them the right to hunt upon open and unclaimed lands is no right at all. Out of the solemn obligations of the treaty, and the express reserved property right which never passed from the Indians to anyone and which the federal government has never extinguished but has expressly recognized before and after Idaho was admitted to the Union, the Nez Perce would now have no right in any respect different than that enjoyed by all others, except perhaps the freedom from the burden of a license fee. This was never intended under the broad, fair and liberal construction of the treaty. The Supreme Court of the United States has recognized and expressly held that the Indian treaty fishing provisions accorded to them rights which do not exist for other citizens. Tulee v. Washington, supra; Seufert Bros. Co. v. United States, supra; United States v. Winans, supra. What are such rights under the State's theory? Perhaps to hunt without a license. If such rights exist as to fishing most assuredly they exist as to hunting. If the State can regulate the time of year in which they may hunt then they are accorded no greater rights in this respect than exist for other citizens."
The court concluded its opinion by holding that the treaty rights reserved by the Nez Perce Indians still existed unimpaired, and that they could hunt at any time of the year on the lands involved in the case.
The supreme court of the United States in 1954 denied the state of Idaho's petition for certiorari in that case. See 347 U.S. 937, 98 L.Ed. 1087, 74 S.Ct. 627. This action on the part of the supreme court was of unusual significance because the Idaho court was interpreting the supremacy clause of the United States constitution and a treaty made in pursuance thereof, a function which could only be authoritatively performed by the supreme court itself.
Since only the supreme court of the United States has the power to finally interpret the meaning of the United States constitution and treaties made in pursuance thereof, and since it has, from 1832 (Worcester case, supra) to 1954 (Arthur case, supra), directly and indirectly upheld the *529 supremacy of rights reserved in Indian treaties over state statutes having the effect of impairing or abrogating those rights, this court is bound by its applicable decisions.
In the instant case, the statutes and regulations involved cannot be held to be applicable to the Puyallup Indians. Therefore, the trial court's judgment dismissing the action was correct, even though its reason (to wit, that the state had failed to sustain the burden of showing as to the Puyallup Indians that the statutes and regulations were reasonable and necessary for the conservation of fish) was wrong. Their reasonableness, or unreasonableness, is immaterial.
Where a judgment or order is correct, it will not be reversed because the court gave a wrong or insufficient reason for its rendition. Kirkpatrick v. Department of Labor & Industries, 48 Wn. (2d) 51, 290 P. (2d) 979.
One more matter must be noticed. The conclusion we have reached from our interpretation of the applicable decisions of the supreme court makes necessary the overruling of four of our prior cases, namely, State v. Towessnute, supra; State v. Alexis, supra; State v. Meninock, supra; and State v. Wallahee, supra. These cases are wrong in principle, and, to the extent that they are contrary to the views stated herein, they are hereby expressly overruled. See the dissenting opinions in those cases and in State v. Tulee, supra.
To summarize, the treaty of Medicine Creek of 1855 is the supreme law of the land and, as such, is binding upon this court, notwithstanding any statute of this state to the contrary, and its provisions will continue to be superior to the exercise of the state's police power respecting the regulating of fishing at the places where the treaty is applicable until:
(1) the treaty is modified or abrogated by act of Congress, or
(2) the treaty is voluntarily abandoned by the Puyallup tribe, or
*530 (3) the supreme court of the United States reverses or modifies our decision in this case.
Judgment affirmed.
SCHWELLENBACH, OTT, and FOSTER, JJ., concur.
ROSELLINI, J. (concurring in the result)
The conservation of the natural resources of this state is a matter of vital importance to all of its inhabitants. The right of the state to enforce its conservation measures is a matter that I do not think should be determined by reference to an opinion of a court of another state when that state chose to ignore language of the United States supreme court that reads:
"The treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish." Tulee v. Washington, 315 U.S. 681, 86 L.Ed. 115, 62 S.Ct. 862.
We have used language of similar import to this in every case in which the question of interpretation of Indian treaty rights has been considered. See State v. Towessnute, 89 Wash. 478, 154 Pac. 805; State v. Alexis, 89 Wash. 492, 154 Pac. 810, 155 Pac. 1041; State v. Meninock, 115 Wash. 528, 197 Pac. 641; State v. Wallahee, 143 Wash. 117, 255 Pac. 94; State v. Tulee, 7 Wn. (2d) 124, 109 P. (2d) 280.
Moreover, I do not think that this court is justified in assuming that, because the supreme court denied certiorari in State v. Arthur, 74 Idaho 251, 261 P. (2d) 135, it approved the holding of that case. That court clearly stated that such an assumption is never warranted. Atlantic Coast Line R. Co. v. Powe, 283 U.S. 401, 75 L.Ed. 1142, 51 S.Ct. 498; United States v. Carver, 260 U.S. 482, 67 L.Ed. 361, 43 S.Ct. 181; House v. Mayo, 324 U.S. 42, 89 L.Ed. 739, 65 S.Ct. 517; Sunal v. Large, 332 U.S. 174, 91 L. Ed 1982, 67 S.Ct. 1588.
Contrary to the Idaho holding are the cases of Makah Indian Tribe v. Schoettler, 192 F. (2d) 224 (C.A. 9th) and McCauley v. Makah Indian Tribe, 128 F. (2d) 867 (C.A. 9th), both of which recognize: (a) the power of the state *531 to subject Indians to restrictions for the purpose of conservation; and (b) that their right to fish, granted by the treaty, is not an unlimited right. The majority, however, chose to ignore these decisions rendered by the Federal circuit court in this state, and to adopt an interpretation of the treaty which deprives the state of all right to protect its fish for the benefit of all of its citizens.
The importance of the conservation measures adopted by the state of Washington may be better understood if some of the factors and problems involved are examined. This information, unfortunately, was not presented in evidence in the trial of this cause, but was gleaned from my own research. While these facts cannot control our decision, I do think that they emphasize the importance of the case and, therefore, should be considered before we decide that the state has no right at all to interfere with the fishing practices of Indians.
This case involves the trapping of salmon and steelhead by means of nets in the Puyallup river. There are five or six species of Pacific salmon; and there are two species of steelhead, those that migrate in the winter and those that migrate in the summer. These anadromous fish are hatched in fresh water and descend to salt water where most of their growth is attained. They have a well-developed homing instinct and return to spawn either in the streams of their birth or the streams where they are planted as fingerlings.
The Pacific salmon spawn only once and always die after spawning; the steelhead may spawn more than once. The salmon and steelhead after remaining in the ocean from three to six years, depending upon their species, return as mature fish to the river of their origin to spawn. They spawn in the upper reaches of the rivers and bury their eggs in the gravel beds. The mature fish usually travel close to the river banks during their spawning migration.
The problems of properly managing and preventing the extinction of this vast fishery resource are of real concern to the state. The Washington department of fisheries, in *532 its 1953 report, placed the capitalized value of fish and shell fish resources in this state at $679,150,000. To this value must be added the contribution of salmon as a recreational asset. In recent years, from 150,000 to 200,000 fishermen have participated in saltwater sport angling on Puget Sound, in waters along the coast of Washington, in the Columbia river as far upstream as Wenatchee, and in other salmon-producing rivers. They spend $8,500,000 annually on fishing trips. There are 160 boathouses and resorts with an investment value of $12,000,000.
The state regulations to conserve and preserve fishery are vital activities in the over-all scheme of administering this resource in such a way that it can provide a constant source of food, wealth, and recreation.
The International Halibut Commission and the International Sockeye Salmon Commission have effectively demonstrated how two nearly extinct species (halibut and sockeye) have been restored by the promulgation and enforcement of conservation laws and regulations.
The methods commonly used to conserve the fish have been to regulate the season's catch and the gear used, to the end that sufficient fish escape to propagate and reproduce themselves. The fish hatchery is essential in combating the depletion of fish runs. Without artificial propagation, the maintenance and rehabilitation of this resource would be impossible. The Washington game department's record of planting and catching steelhead in the Puyallup river is persuasive of the need for this artificial propagation.

 PUYALLUP RIVER
 Year Steelhead Plants Year Steelhead Returns
 1945 ............ 37,694 ............
 1946 ............ 65,877 ............
 1947 ............ 177,596 ............ 1947-48 .......... 1,771
 1948 ............ 53,467 ............ 1948-49 .......... 3,921
 1949 ............ 298,300 ............ 1949-50 .......... [*]4,821
 1950 ............ 283,914 ............ 1950-51 .......... 4,808
 1951 ............ 66,462 ............ 1951-52 .......... [**]14,592
 1952 ............ 174,682 ............ 1952-53 .......... 14,190
 1953 ............ 81,124 ............ 1953-54 .......... 16,886
 1954 ............ 53,935 ............ 1954-55 .......... 13,351
*533 1955 ............ 70,270 ............ 1955-56 .......... 18,496
 1956 ............ 56,876 ............ 1956-57 .......... (Data not yet
 available)

The defendants herein had two set nylon nets in the Puyallup river. The shorter one was 80 feet in length and 20 feet in width or depth, with 6 1/2 inch diamond-shaped webbing. The longer net was the same, except that it was 140 feet in length. The shorter net was anchored at one end to the bank by means of a rock; and the longer net was upstream from the shorter one and anchored to the bank by means of piling. The opposite ends of each net were anchored with pilings in the stream, each net running at right angles to the bank of the river.
When fish attempt to migrate upstream, they are caught and become enmeshed by their gills in the webbing of set nets. Nylon nets are a new device; they are practically invisible in the water. Such nets are so constructed that they take practically every fish that attempts to go upstream.
Any obstruction that prevents the anadromous fish from escaping to its spawning ground will destroy that particular fish run. The regulations in question were enacted to prevent such obstructions and other interference with the fish during the spawning season. I do not think it can be seriously questioned that such laws and regulations for conservation, as generally applied, are reasonable.
The majority chose to enlarge the ruling of Tulee v. State, supra, that the state has no right to exact a license fee from the Indians for a privilege guaranteed to them by the treaty with the United States. It enlarged this ruling to a holding that state regulations designed to conserve the fish may not be enforced against the Indians. The majority opinion does this in spite of the fact that it recognizes the right of the state to impose such restrictions outside the reservation, and in spite of the fact that the treaty provides that the right is to be "enjoyed in common with all the citizens of the Territory."
*534 The treaty with the Indians should be construed in the light of the conditions and circumstances existing at the time it was executed. It was never anticipated nor imagined at that time that the present technological advances in the method of taking fish would be developed. Nylon net was unknown. The Indians did not possess the technical knowledge nor materials to manufacture nets in lengths sufficient to span an entire stream. The outboard motor was nonexistent.
To interpret the treaty in a manner that would permit the Indians to use the best and most advanced techniques and equipment to the extent that the fish are destroyed would, in my opinion, go far beyond what was intended either by the citizens of the Territory or the Indians. Inherent in the treaty is the implied provision that neither of the contracting parties would destroy the very right and bounty which each sought to share.
The argument is made that if the state may forbid fishing during certain seasons, it may forbid it altogether, but the unreasonableness of such a law should be manifest.
As a practical matter, it has been determined that unless these conservation measures are enforced, the fish will become extinct and the Indians' rights will become worthless. If the Indians will accept the benefit of the state's activities directed to the preservation and replenishing of the supply of fish, they should accept also the burden incident to these measures. Surely, it was never contemplated that the right given to the Indian should be used to destroy the means of his enjoying that right  a destruction that would affect not only the Indians but also the other citizens entitled to fish the waters of the state.
The trial court decided this case against the state on the ground that the state had failed to sustain the burden of proving that the regulation was reasonable and necessary or rather, that the enforcement of the regulation against the defendants was reasonable and necessary for the preservation of fish. In doing so, the court adopted the holding of Makah v. Schoettler, supra. It is the general rule that *535 such a regulation is presumed to be valid and the burden of proving its invalidity is upon the party challenging the regulation. The court, however, felt that in such a case as this  where the enforcement of the regulation, if not reasonable and necessary, would infringe a treaty right of the Indian  the burden should be upon the state to show that the violation of the regulation by the Indian threatens the conservation program. I would uphold the trial court in its disposition of the cause, for it is true that the state made no attempt to show that the conservation program was seriously affected by the fishing activities of the defendants or of the Indians generally. But I would not go further, as the majority has, to say that the treaty intended that the state may never interfere with fishing by Indians in their usual and accustomed places, no matter how wasteful and destructive their fishing may be. Such a holding is unnecessary to a decision of the case. Furthermore, I think it is unwarranted under the facts and the law.
For these reasons, I would affirm the trial court's judgment.
HILL, C.J., FINLEY, and MALLERY, JJ., concur with ROSELLINI, J.
FINLEY, J. (concurring in the result)
I have signed the concurring opinion written by Judge Rosellini and join in the views expressed therein, but wish to add the following brief comments:
Considering their length and depth, the modern nylon nets used by defendants, if placed in the river and left there, as in the instant case, unquestionably would constitute a hazard to the escapement upriver of spawning salmon and steelhead during certain periods of the year. The extent or the degree of the seriousness of the hazard in terms of conservation and rehabilitation of fish life is a matter that would be subject to proof, as in any other case.
In this connection, it should be noted that the instant case focuses attention only upon defendants and their nets. Considering the matter of conservation and the equally, if *536 not more, important matter of rehabilitation of the fish runs in the rivers and streams of this state in relation to reasonable police power regulations, the problem posed would seem to involve not only the question of the use and effect of the modern nylon nets of defendants, but the use and effect of such nets by numbers of other individuals, including other Puyallup Indians.
The majority opinion states that the constitution of the United States and the treaties enacted or promulgated pursuant thereto unquestionably have been held to constitute the supreme or controlling law of the land. With this I agree without any reservation whatsoever. But the constitution and the treaties enacted pursuant thereto are basic documents of government. They do not in and of themselves spell out and govern specifically the myriad details and day-to-day implications which may and do arise in relation to such documents of government. Such definitive enunciation normally falls within other areas of social control; i.e., within the proper ambit of the legislature or the judiciary. Under our system of government, there should no longer be any doubt as to (1) the validity of the doctrine of judicial review, (2) the supremacy of the judiciary in this respect, and (3) that interpretation and clarification of constitutional, statutory, or treaty provisions by the judiciary are acceptable and established principles. The problem in the instant case must be viewed in this light, and I think the fundamental question is the reasonableness of the police power regulation attempted by the state of Washington.
Setting aside, merely for the moment, any discussion or consideration of constitutional and treaty provisions, there should be little doubt that reasonable police power regulation as an abstract matter would be desirable when, as, and if, necessary to prevent the depletion or absolute destruction of fish life in the rivers and streams of this state. This should be true from the standpoint of the Indians, as well as of other residents of the state. Now, if we turn back several decades, in view of the then overabundant quantities of *537 fish in the rivers, streams, lakes, and other waters of the Pacific Northwest, it is unlikely that the parties to the Indian treaty contemplated any necessity for scientific conservation and rehabilitation; but what would the attitude of the makers of the Indian treaty have been, if they had considered or had been confronted with the problem of conservation and rehabilitation? As to this question, the majority opinion would attribute an abysmal ignorance and lack of intelligence both to our constitution makers and to the signatories of the Indian treaties. The assumption inherent in this, I think, is unwarranted.
As to the validity of the state regulation here involved, I think the inquiry of the court should be directed to the intent and purpose of the treaty makers in the same manner that judicial inquiry is made respecting intent and purpose in the process of interpretation and application of any provisions of our state or Federal constitutions.
The basic purpose of the treaty was to preserve, not to destroy, the fishing rights of the Indians. As I see the problem in the case at bar, it is simply one of approach or orientation regarding (a) the interpretation and application of constitutional and treaty provisions and (b) the nature of the judicial function in relation thereto. If even one judicial eye is kept open respecting the fundamental purpose of the treaty to protect Indian fishing rights, and if this purpose is evaluated intelligently in terms of the settlement and the development of our state which has taken place most significantly in the last fifty years, then it seems to me that the state of Washington, as a matter of constitutional right, should have at least an opportunity to prove by competent factual data that the police power regulation here involved is a reasonable one, not inconsistent with the purpose of the Indian treaty but in furtherance thereof, from which the courts might or might not conclude that the regulation would be valid. In other words, as Judge Rosellini suggests, the problem is one of proof.
It may be suggested, and if so it is certainly true, that the Puyallup Indians did not encourage or sponsor, and are *538 not to be held morally or legally responsible for, the increase in population and the development of the state of Washington. However, this significant increase in population and the development of the state were not prohibited by the terms of the Indian treaty. Even if not contemplated, the changes that have taken place were perhaps inevitable. In any event, the changes have taken place and are now with us and the Indians as well.
Judicial recognition of the fundamental purpose of the treaty (i.e., the preservation of Indian fishing rights) and judicial recognition of the facts of life relative to conservation and rehabilitation of fish are not inconsistent. Such judicial action is not in derogation and in violation of the Indian treaty, but is in furtherance thereof. In his concurring opinion, Judge Rosellini states that the only question in this case is whether the state has proved by competent evidence that regulation of fishing nets in the river is reasonably designed and necessary for the preservation of fish life for the benefit of the Indians, as well as for other residents of this state. I agree. For the above reasons and those stated by Judge Rosellini, I concur in the end result reached by the majority opinion  namely, that the decision of the trial court should be affirmed.
ADDENDUM BY HILL, C.J. The eight judges who heard the En Banc argument on this case on February 13, 1957 (Judge Weaver being incapacitated at that time), are agreed that the order of the trial court dismissing the charges against the two defendants should be affirmed, but they are in disagreement as to the reason for the affirmance.
Three judges have signed Judge Donworth's opinion, and three judges have signed Judge Rosellini's opinion, and there is no majority opinion. It therefore follows that the cases which Judge Donworth's opinion states are overruled, are not in fact overruled, and nothing is decided except that the order dismissing the charges against the defendants is affirmed.
NOTES
[1] Reported in 314 P. (2d) 400.
[*] (1950 first true downstream migrants planted)
[**] (First return of hatchery fish)